553 F.2d 146
 180 U.S.App.D.C. 1
 UNITED STATES of America, Appellant,
v.
Carroll D. FORD.
UNITED STATES of America, Appellant,
v.
Wesley DESSASO a/k/a Wesley Dessaso, Jr.
UNITED STATES of America, Appellant,
v.
Steve F. DaCOSTA.
UNITED STATES of America, Appellant,
v.
Daniel HAILE, Jr.
UNITED STATES of America, Appellant,
v.
Melvin E. SMITH et al.
 Nos. 76-1467, 76-1468, 76-1501 to 76-1503.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 21, 1976.
Decided Feb. 11, 1977.
 
 Robert M. McNamara, Jr., Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., and John A. Terry and Daniel J. Bernstein, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellant.
 James L. Lyons, Washington, D. C. (appointed by this court), for appellee in No. 76-1468; also argued for appellees in Nos. 76-1467 and 76-1503.
 Robert E. Walter, Jr., Arlington, Va., for appellees in Nos. 76-1501 and 76-1502.
 Henry J. Monahan, Rockville, Md. (appointed by this court), was on the brief for appellee in No. 76-1467.
 Theodore J. Christensen, Washington, D. C. (appointed by this court), was on the brief for appellees in No. 76-1503.
 Charles J. Broida, Columbia, Md., was on the brief for appellee in No. 76-1501.
 Charles F. Barker, Washington, D. C. (appointed by this court), was on the brief for appellee in No. 76-1502.
 Orie Seltzer, Washington, D. C., entered an appearance for appellee Melvin E. Smith in No. 76-1503.
 Before BAZELON, Chief Judge, and WRIGHT and ROBINSON, Circuit Judges.
 Opinion for the court filed by J. SKELLY WRIGHT, Circuit Judge.
 J. SKELLY WRIGHT, Circuit Judge:
 
 
 1
 The District Court for the District of Columbia granted motions to suppress certain evidence gathered by electronic surveillance of appellees' conversations. On this appeal by the Government[1] from that ruling the facts are not in dispute.
 
 
 2
 From early 1975 members of the Narcotics Branch of the Metropolitan Police Department suspected that the Meljerveen Ltd. Shoe Circus, a shoe store in Northwest Washington, D. C., was the locus of narcotics distribution activity. Over a period of months these suspicions were corroborated by information received through intermittent physical surveillance of the store and from informants, some of whom made controlled purchases of narcotics there.[2] The police concluded that the narcotics operation was extensive, but they were unable to gather sufficient information as to the persons involved.[3] Therefore, they decided to seek a court order authorizing electronic surveillance.[4] Their information indicated that the proprietor of the Shoe Circus and prime suspect, Melvin E. Smith, mistakenly believed his telephone was already under surveillance, i. e., the object of a wiretap order, and that, therefore, he would not discuss narcotics activity over the telephone.[5] The police concluded that under the circumstances a wiretap would be fruitless, so a decision was made to seek judicial authority to install eavesdropping devices "bugs" inside the premises.[6]
 
 
 3
 On September 4, 1975 an Assistant United States Attorney and a Metropolitan Police Department Narcotics Branch detective[7] approached a judge of the District Court and presented to him a lengthy affidavit of probable cause and a surveillance order prepared for his signature. The Assistant United States Attorney informed the authorizing judge, off the record, that the police intended to effect entry into the Shoe Circus by means of a bomb-scare ruse.[8] After questioning the detective on the issue of probable cause and instructing him as to statutory minimization,[9] the authorizing judge signed the intercept order submitted by the Assistant United States Attorney.
 
 
 4
 In accordance with the provisions of the District of Columbia Code governing capture of wire and oral communications, the 20-day[10] intercept order called for minimization and periodic progress reports to the authorizing judge.[11] Unlike most electronic surveillance orders which authorize strictly non-trespassory wiretaps[12] this warrant permitted an undesignated number of "bugs" to be placed inside the Shoe Circus "as soon as practicable."[13] Paragraph (d) of the intercept order read:
 
 
 5
 (d) Members of the Metropolitan Police Department are hereby authorized to enter and re-enter the Meljerveen Ltd. Shoe Circus located at 4815 Georgia Avenue, Northwest, Washington, D. C., for the purpose of installing, maintaining and removing the electronic eavesdropping devices. Entry and re-entry may be accomplished in any manner, including, but not limited to, breaking and entering or other surreptitious entry, or entry and re-entry by ruse and stratagem.
 
 
 6
 Intercept order at 3, JA 45 (emphasis added). Acting pursuant to this authorization, police posing as a unit of the bomb squad appeared at the Shoe Circus on September 5. The store was evacuated and three "bugs" were installed, with at least one of the devices being placed in an area of the store not open to the general public. The operation lasted approximately half an hour.
 
 
 7
 It appears that on the following day police assigned to monitor conversations taking place inside the Shoe Circus discovered that none of the devices was transmitting. The Assistant United States Attorney was notified, and he in turn informed the authorizing judge. Remarking that there was, in his opinion, little likelihood of successful re-entry by means of another bomb-scare ruse, the authorizing judge nevertheless apparently concurred in the Assistant United States Attorney's plan. No record was made of these entirely informal conversations. Again using a bomb-scare ruse, police made a second daytime entry on September 10, 1975 and installed two additional devices, one in a non-public area. This time the devices did not malfunction, and during the next five weeks the police successfully monitored numerous narcotics-related conversations.
 
 
 8
 There is no indication that any further entries were made until October 15, 1975, when, prior to the expiration of an extension order issued September 26, 1975, the police entered without subterfuge to remove the listening devices. The intercepted conversations were subsequently presented to the grand jury. On February 6, 1976 indictments were issued charging appellees with various narcotics-related offenses.[14] Appellees moved to suppress the electronic surveillance evidence, and a hearing was held[15] at which the Government vigorously contended that this essential element of the prosecution's evidence had been validly seized. In a memorandum and order dated April 23, 1976 the District Court granted appellees' motions to suppress. United States v. Ford, 414 F.Supp. 879 (D.D.C.1976). The instant appeal ensued.
 
 
 9
 * The District Court found that the police had received reliable information and had concluded on "substantial evidence"[16] that a narcotics business was being operated, primarily during night hours, at the Shoe Circus. It determined that the authorizing judge had been furnished a detailed showing of probable cause,[17] and had been kept fully informed of police actions taken under the authority of the intercept order.[18] The court concluded that in enacting Title III of the Omnibus Crime Control and Safe Streets Act of 1968 and the parallel provisions of the District of Columbia Code[19] Congress intended to confer jurisdiction on the courts to authorize covert entry by police for the purpose of installing eavesdropping devices.[20] Thus the District Court ruled by implication that certain statutory safeguards governing execution of search warrants issued for seizure of specified items were inapplicable in this case.[21] It reasoned, however, that the total absence of statutory limitations or restrictions on entry of private premises to install "bugs,"[22] combined with the continuous and undiscriminating nature of the seizure,[23] placed an "extraordinarily heavy burden"[24] on the authorizing judge to tailor his order narrowly and thereby minimize the scope of the total intrusion.
 
 
 10
 According to the District Court, the order in question failed to meet these criteria. Since no formal record of any of the discussions between the Assistant United States Attorney and the authorizing judge had been made, the intercept order had to stand or fall on its own terms,[25] which were impermissibly overbroad. The court discussed the authorization necessary in this type of case:
 
 
 11
 A warrant must be specific. * * * Where more than one entry is involved each intrusion must be treated formally and approved in advance so that the judge or magistrate can supervise when and how the entry is to be accomplished. * * * The authorization given in this instance did not limit the number of entries nor did it specify either the general time or manner of entry. Thus the authority given was far too sweeping.
 
 
 12
 United States v. Ford, supra, 414 F.Supp. at 884. The court held that because the authorization was invalid the District of Columbia Code mandated suppression of the evidence obtained by the electronic surveillance.
 
 II
 The Fourth Amendment states:
 
 13
 The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
 
 
 14
 The present case implicates two distinct aspects[26] of the Fourth Amendment: unconsented physical entry into private premises[27] and recording of oral statements.[28] We deal primarily with the first aspect. The Government's initial contention is that surreptitious entry into private premises, for the limited purpose of installing, maintaining, or removing bugging equipment, is not independently within the Fourth Amendment's protections, and that an entry provision is "not required by either the Supreme Court or Congress to be part of the order." Government br. at 8. Therefore, it is argued, the surreptitious entry provision, whether or not overbroad, constituted surplusage and should have been irrelevant to any judicial scrutiny of the intercept order.
 
 
 15
 In cases involving physical intrusions into private premises the Supreme Court has repeatedly recognized that the individual has an interest in "limiting the circumstances under which the sanctity of his home may be broken by official authority."[29] The basic purpose of the Fourth Amendment, the Court has stated, "is to safeguard the privacy and security of individuals against arbitrary invasions by government officials."[30] Indeed, until Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), unauthorized electronic eavesdropping on conversations, when not accomplished by an invasion of a constitutionally protected area, did not even violate the Fourth Amendment. Because no right of conversational privacy had been recognized, the Court "insisted only that the electronic device not be planted by an unlawful physical invasion of a constitutionally protected area." Lopez v. United States, 373 U.S. 427, 438, 83 S.Ct. 1381, 1388, 10 L.Ed.2d 462 (1963). Exclusion of verbal evidence obtained by trespass vindicated only the right to be secure from illegal governmental invasion of private premises. Alderman v. United States, 394 U.S. 165, 177-178, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969).[31] We conclude, after analysis of the underlying policy considerations and well established precedents, that surreptitious physical invasion of a home or protected business premises,[32] when undertaken by police agents for the purpose of installing, maintaining, or removing electronic eavesdropping devices, is, absent a valid consent or sufficiently particularized judicial authorization to enter, a violation of the Fourth Amendment. Thus the surreptitious entry provision in the warrant here was not surplusage. It was a necessary precondition to the Government's unconsented entries into the Shoe Circus and the failure adequately to limit the authorization to enter was a fatal defect.
 
 A.
 
 16
 In Irvine v. California, 347 U.S. 128, 74 S.Ct. 381, 98 L.Ed. 561 (1954) decided seven years before Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), applied the exclusionary rule to state court prosecutions police officers surreptitiously entered the petitioner's home, without a warrant, on three separate occasions to install and reposition an eavesdropping device.[33] Relying on the principle of Wolf v. Colorado, 338 U.S. 25, 33, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949),[34] that evidence seized in violation of the Fourth Amendment was not required by the Constitution to be excluded in state court prosecutions where no coercion, violence, or brutality to the person was involved, a sharply divided Court affirmed the conviction. The plurality nevertheless commented in the following language on what had transpired:
 
 
 17
 Each of these repeated entries of petitioner's home without a search warrant or other process was a trespass, and probably a burglary, for which any unofficial person should be, and probably would be, severely punished. * * * That officers of the law would break and enter a home, secret such a device, even in a bedroom, and listen to the conversation of the occupants for over a month would be almost incredible if it were not admitted. Few police measures have come to our attention that more flagrantly, deliberately, and persistently violated the fundamental principle declared by the Fourth Amendment * * *. * * *
 
 
 18
 347 U.S. at 132, 74 S.Ct. at 382-383 (emphasis added).[35]
 
 
 19
 The Court was again confronted with trespassory electronic eavesdropping in Silverman v. United States, 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961), though in that case the physical invasion was arguably less severe. A "spike mike" was driven through an adjoining wall and, although no agent ever physically entered the premises, the device made contact with the heating duct system of the home where the incriminating conversations were expected to take place. The Court, in reversing the conviction under the exclusionary rule of Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), stated:
 
 
 20
 Eavesdropping accomplished by means of such a physical intrusion is beyond the pale of even those decisions in which a closely divided Court has held that eavesdropping accomplished by other electronic means did not amount to an invasion of Fourth Amendment rights. * * *
 
 
 21
 365 U.S. at 509-510, 81 S.Ct. at 682.[36] Furthermore, the Court declared it had
 
 
 22
 never held that a federal officer may without warrant and without consent physically entrench into a man's office or home, there secretly observe or listen, and relate at the man's subsequent criminal trial what was seen or heard.
 
 
 23
 Id. at 512, 81 S.Ct. at 683.[37] If, as the Court stated in Irvine, entering private premises to plant an eavesdropping device is, for Fourth Amendment purposes, equivalent to ensconcing a police agent, and Silverman established the latter as a subject of the Amendment's strictures,[38] the Amendment must also encompass surreptitious entry of the kind involved in this case.[39]
 
 B.
 
 24
 The Government seems to concede that under these cases trespass was the focus of constitutional protection. It argues, however, citing Berger v. New York, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967), and Katz v. United States, supra, that with the advent of constitutional protection for conversational privacy physical entries incident to electronic surveillance no longer require prior judicial approval. To put it mildly, we cannot agree.
 
 
 25
 In Berger the necessity of judicial authorization for the trespassory invasion was not at issue because each of the two surreptitious entries which took place was the subject of prior judicial approval.[40] Nevertheless, the Court recognized that protection from unauthorized intrusion into private premises is a primary concern of the Fourth Amendment.[41] It outlined some of the safeguards present in other cases where it had held the Amendment's requirements met. Among these protections were: issuance of a warrant allowing one limited intrusion rather than a series of intrusions or continuous surveillance; issuance of a warrant drawn to foreclose any search of unauthorized areas; and obtaining of a new order on a new showing of probable cause, by officers seeking to resume the search.[42]
 
 
 26
 In Berger the Court was concerned with the question whether the challenged New York statute was facially invalid in that it permitted the second aspect of the search the overhearing to be undertaken by general warrant, contrary to the Amendment's command. But Berger certainly did not reject the then established premise that surreptitious entry for the purpose of installing electronic surveillance devices was within the ambit of the Fourth Amendment. Kaiser v. New York, 394 U.S. 280, 282, 89 S.Ct. 1044, 22 L.Ed.2d 274 (1969). Rather, the Court extended particularity protections formerly applicable only to the trespass to the overhearing in those cases where both aspects of the Amendment were implicated.
 
 
 27
 Similarly, there is no indication that the majority in Katz intended to alter the rule applicable to physical invasion when, in explicitly overruling Goldman v. United States, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322 (1942), and Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928), it announced that henceforth even incursions on conversational privacy accomplished by non-trespassory means would be subject to the Amendments' strictures. Stating that "the correct solution of Fourth Amendment problems is not necessarily promoted by incantation of the phrase 'constitutionally protected area,' " 389 U.S. at 350, 88 S.Ct. at 510 (emphasis added), the Court continued:
 
 
 28
 (O)nce it is recognized that the Fourth Amendment protects people and not simply "areas" against unreasonable searches and seizures, it becomes clear that the reach of that Amendment cannot turn upon the presence or absence of a physical intrusion into any given enclosure.
 
 
 29
 389 U.S. at 353, 88 S.Ct. at 512 (emphasis added).
 
 
 30
 The decision "in Katz refused to lock the Fourth Amendment into instances of actual physical trespass," United States v. United States District Court (Keith), 407 U.S. 297, 313, 92 S.Ct. 2125, 2135, 32 L.Ed.2d 752 (1972); it was intended to expand the scope of the Amendment's protection and not to diminish existing safeguards against unwarranted invasions of physical privacy.[43] This is the clear lesson of the Supreme Court's Alderman decision,[44] in which the Court stated:
 
 
 31
 Nor do we believe that Katz, by holding that the Fourth Amendment protects persons and their private conversations, was intended to withdraw any of the protection which the Amendment extends to the home or to overrule the existing doctrine, recognized at least since Silverman, that conversations as well as property are excludable from the criminal trial when they are found to be the fruits of an illegal invasion of the home. * * *
 
 
 32
 394 U.S. at 180, 89 S.Ct. at 970 (emphasis added). Surreptitious entries of the type authorized here are undoubtedly invasions of privacy. They may entail inspection of the premises while police search for suitable places to install or relocate the necessary devices or while personnel charged with maintenance or removal search for devices previously installed. Such entries will often bring government officers within plain view of personal papers and effects. Even if it were to be assumed that such entries inevitably represent less aggravated incursions than traditional rummaging searches, they would remain within the sphere of the Fourth Amendment. Contrary to the Government's contention, the Fourth Amendment's protections against physical trespass do not disappear simply because a probable cause showing has been made, and statutory authorization received, for gathering oral evidence. Quite the contrary, the least intrusive means rationale implicit in Katz and Keith requires that, where possible, such evidence should be gathered without entering private premises and that where entry is required the judicial authorization therefor should circumscribe that entry to the need shown.
 
 C.
 
 33
 The Government next argues, however, that even if surreptitious entries to install, maintain, or remove eavesdropping devices are within the ambit of the Fourth Amendment they should not be subjected to the Amendment's warrant procedure, provided there is a proper warrant authorizing seizure of conversations. It is contended that if the police enter with probable cause and intend to intercept oral communications under the authority of a Title III order, the incursions on physical privacy are per se reasonable and should be validated without regard to the terms of a surreptitious entry provision in the judicial order.[45] Under this approach the overbroad entry provision in the intercept order would again be surplusage.
 
 
 34
 We reiterate that in determining whether issuance of an order for seizure of conversations obviates the need to obtain prior judicial approval of ancillary entries, we are cognizant of the fact that bugging, unlike nontrespassory wiretapping, ordinarily involves two distinct aspects of the Fourth Amendment: protection of private premises and of conversational privacy from unwarranted governmental intrusion.[46] Moreover, in Fourth Amendment jurisprudence " 'search' and 'seizure' are not talismans." Terry v. Ohio, 392 U.S. 1, 19, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). The "Amendment governs all intrusions by agents of the public upon personal security," id. at 18 n.15, 88 S.Ct. at 1879, and requires adherence to judicial processes in order that the deliberate and impartial judgment of a judicial officer will be interposed between the citizen and the police.[47] The Fourth Amendment protects a right of privacy and the warrant clause was included
 
 
 35
 so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals. * * * And so the Constitution requires a magistrate to pass on the desires of the police before they violate the privacy of the home. * * *
 
 
 36
 McDonald v. United States, 335 U.S. 451, 455-456, 69 S.Ct. 191, 193, 93 L.Ed. 153 (1948), quoted in Chimel v. California, 395 U.S. 752, 761, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).
 
 Therefore, the Government's argument
 
 37
 touches the very heart of the Fourth Amendment directive: that, where practical, a governmental search and seizure should represent both the efforts of the officer to gather evidence of wrongful acts and the judgment of the magistrate that the collected evidence is sufficient to justify invasion of a citizen's private premises or conversation. * * *
 
 
 38
 Keith, supra, 407 U.S. at 316, 92 S.Ct. at 2136 (emphasis added).[48] Generally, it is insisted that
 
 
 39
 in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. * * *
 
 
 40
 Terry v. Ohio, supra, 392 U.S. at 21, 88 S.Ct. at 1880 (emphasis added; footnote omitted). Thus, unless a judicially created exception to the warrant requirement can be invoked, when a case involves incursions on both private premises and conversational privacy, each requires prior valid judicial authorization though such authorization may be contained in the same document.
 
 
 41
 Exemptions from the warrant requirement have been few in number and generally have been created in that class of cases where an exception is considered necessary to protect the well-being of officers or to preserve evidence from destruction.[49] Recently the Supreme Court has held "hot pursuit" to be sufficient reason in certain circumstances to permit warrantless entry onto private premises. United States v. Santana, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976). No contention is made, however, that any of these existing justifications is applicable in this case, so we must determine whether a new exception should be created for surreptitious entries to install, maintain, or remove "bugs." In this inquiry the question is not whether the public interest requires this type of incursion on privacy to achieve valid ends of law enforcement. Rather, it is whether the authority to enter "should be evidenced by a warrant, which in turn depends in part upon whether the burden of obtaining a warrant is likely to frustrate the governmental purpose * * *." Camara v. Municipal Court, 387 U.S. 523, 533, 87 S.Ct. 1727, 1733, 18 L.Ed.2d 930 (1967).[50]
 
 
 42
 The Government maintains that courts do not have the expertise necessary to weigh adequately the desirability and feasibility of various methods of entry, and that the incremental invasion of privacy entailed by surreptitious entry is relatively minor. The first argument proves too much, however, for it would lead not only to abrogation of the warrant requirement, but also to the unacceptable conclusion that courts are inherently incapable of reviewing the reasonableness of police action taken with the intent to install or maintain eavesdropping devices.[51] The second "is founded on little more than a subjective view regarding the acceptability of certain sorts of police conduct, and not on considerations relevant to Fourth Amendment interests." Chimel v. California, supra, 395 U.S. at 764-765, 89 S.Ct. at 2041.[52] As the District Court here properly recognized, surreptitious entry to install, maintain, or remove "bugs" is a serious invasion because
 
 
 43
 (f)reedom from intrusion into the home or dwelling is the archetype of the privacy protection secured by the Fourth Amendment. * * *
 
 
 44
 * * * The requirement of a warrant, as now generally understood, rests primarily on the conception that it is for a judicial officer, and not the prosecutor or police, to determine whether the security of our society, which is essential to the maintenance of a rule of law, requires that the right of privacy yield to a right of entry, search and seizure, and what limitation and specification of entry may be appropriate and reasonable. * * *
 
 
 45
 Dorman v. United States, 140 U.S.App.D.C. 313, 317, 435 F.2d 385, 389 (1970) (en banc ) (emphasis added; footnote omitted). Moreover, the Supreme Court has recently stated that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed * * *." Keith, supra, 407 U.S. at 313, 92 S.Ct. at 2134.
 
 We do not
 
 46
 deal here with an entire rubric of police conduct necessarily swift action predicated upon the on-the-spot observations of the officer on the beat which historically has not been, and as a practical matter could not be, subjected to the warrant procedure. * * *
 
 
 47
 Terry v. Ohio, supra, 392 U.S. at 20, 88 S.Ct. at 1879. Entry into private premises is the traditional focus of the warrant requirement.[53] By virtue of the requirements outlined in Title III, a judicial officer is inevitably and intimately involved in electronic surveillance situations. We believe, therefore, the only rationale for creating a categorical exemption from the warrant requirement for surreptitious entries to install, maintain, or remove electronic surveillance devices would be the convenience of the executing officers.
 
 
 48
 In light of the privacy interests implicated, the legislative history of Title III,[54] specific findings and provisions in the District of Columbia Code,[55] and the Supreme Court's recognition that exigency factors will rarely, if ever, be present in instances of electronic surveillance,[56] we conclude that the minor incremental burden involved in obtaining proper judicial authorization for the particular invasions of privacy at issue here is not sufficient justification for dispensing with a fundamental Fourth Amendment requirement.[57] When police seek to invade, surreptitiously and without consent, a protected premises to install, maintain, or remove electronic surveillance devices, prior judicial authorization in the form of a valid warrant authorizing that invasion must be obtained.[58]
 
 III
 
 49
 Our conclusion that surreptitious entries to install, maintain, or remove electronic surveillance devices are subject to the warrant requirement of the Fourth Amendment mandates consideration of the legal sufficiency of the intercept order's entry provision. As noted above, see pages --- - --- of 180 U.S.App.D.C., pages 151-152 of 553 F.2d supra, the District Court determined that the order was overbroad and that the overbreadth was more than a technical defect. Therefore, the order was "insufficient on its face." United States v. Ford, supra, 414 F.Supp. at 885. Of course, in determining whether issuance of a particular warrant was justified, affidavits of probable cause are to be tested in a commonsense, realistic fashion. United States v. Ventresca, 380 U.S. 102, 108, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965). The issuing magistrate's determination of probable cause should be paid great deference by reviewing courts. Jones v. United States, 362 U.S. 257, 270-271, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). But intercept orders issued under Title III or the parallel provisions of the District of Columbia Code, like other warrants, must be subjected to a review which will "ensure that the issuing magistrate properly performed his function and did not 'serve merely as a rubber stamp for the police.' " United States v. Kalustian, 529 F.2d 585, 589 (9th Cir. 1976), quoting United States v. Ventresca, supra, 380 U.S. at 109, 85 S.Ct. 741.
 
 
 50
 The reviewing court thus has a duty to determine whether the showing of probable cause was sufficient to justify the intrusion authorized.[59] In Berger v. New York, supra, the Court stressed that
 
 
 51
 (t)he need for particularity and evidence of reliability in the showing required when judicial authorization of a search is sought is especially great in the case of eavesdropping. * * * As was said in Osborn v. United States, 385 U.S. 323, (87 S.Ct. 429, 17 L.Ed.2d 394) (1966), the "indiscriminate use of such devices in law enforcement raises grave constitutional questions under the Fourth and Fifth Amendments," and imposes "a heavier responsibility on this Court in its supervision of the fairness of procedures . . ." At 329, n.7 (87 S.Ct. at 433). * * *
 
 
 52
 388 U.S. at 56, 87 S.Ct. at 1882. The procedure used in Osborn, for example, was
 
 
 53
 lawful because there was sufficient proof to obtain a search warrant to make the search for the limited purpose outlined in the order of the judges. Through these "precise and discriminate" procedures the order * * * afforded similar protections to those that are present in the use of conventional warrants authorizing the seizure of tangible evidence. * * *
 
 
 54
 388 U.S. at 57, 87 S.Ct. at 1882. And the Court reserved its strongest criticism for that aspect of the New York eavesdropping law which authorized "the equivalent of a series of intrusions, searches, and seizures pursuant to a single showing of probable cause." 388 U.S. at 59, 87 S.Ct. at 1883. See also pages --- - --- of 180 U.S.App.D.C., pages 156-158 of 553 F.2d supra.
 
 
 55
 Nevertheless, by analogy to an intercept order authorizing multiple conversational seizures, the Government contends that a valid warrant might authorize multiple entries during the period of authorized electronic surveillance even if, at the time the warrant issues, there is no demonstrated need or individualized judicial finding of necessity for multiple incursions.[60] Admittedly, Title III and the parallel provisions of the District of Columbia Code of necessity do allow individual conversations to be seized without a prior determination by the issuing magistrate that they are covered by the warrant authorizing the bugging. After the surveillance is completed, if it is challenged, a reviewing court determines whether particular challenged conversations were illegally seized. However, this procedure is akin to post-search examination of whether police have exceeded the authority of the warrant by seizing items not particularly described,[61] and does not obviate the Fourth Amendment's command that the official intrusion on private premises have prior valid judicial authorization based on sufficient probable cause.[62] In accord with the mandate of Berger, Title III and the parallel provisions of the District of Columbia Code require the demonstration of probable cause to be coextensive with the intrusion permitted.[63]
 
 
 56
 The affidavits submitted in support of the application for the intercept order reveal that the showing of probable cause was less than sufficient to support the entry provision in the order.[64] The affiant did allege facts which, if true, would allow a judicial officer to determine that non-trespassory electronic surveillance would not succeed in achieving the conversational seizures and that "bugging" inside the premises would be required. But the affidavits are totally devoid of allegations which would warrant the conclusion that the executing officers needed freedom to make multiple entries at any time of day or night, by any means they believed necessary.[65]
 
 
 57
 A person whose physical privacy is to be invaded has a right to expect the judicial officer issuing an intercept order will authorize only those entries and those means of entry necessary to satisfy the demonstrated and cognizable needs of the applicant. This is the method by which the magistrate exercises the degree of supervision required by the Fourth Amendment in the absence of statutory safeguards. There having been a failure in this regard, we affirm the judgment of the District Court that, given the showing to the District Judge in this case, the failure of the order to limit time, manner, or number of entries over a 40-day period[66] made the authorization far too sweeping.[67]
 
 
 58
 We do not decide when, if ever, surreptitious entries are reasonable within the Fourth Amendment. Assuming that such entries are sometimes constitutional, we hold only that the warrant in this case was defective for expressly authorizing any number and manner of entries when there had been no showing of necessity for such broad authorization. Essential to our holding is the premise that entries to plant "bugs" are themselves invasions of privacy distinct from the actual eavesdrop, and therefore require separate consideration in the warrant procedure. If police are to be permitted to enter private premises to conceal eavesdropping devices a question we leave unresolved they at least must be required to proceed in accordance with the authorization of a warrant narrowly tailored to the demonstrated demands of the situation.
 
 IV
 
 59
 Turning to the Government's contention that suppression of the evidence is not the proper remedy to be applied in this case, we find an essentially threefold argument. Appellant maintains (1) that statutory suppression is not applicable; (2) that any violation was merely technical and, therefore, the evidence should not be suppressed; and (3) suppression, if ordered, must be under the judicially fashioned exclusionary rule, and its application turns not only on the degree of the violation, but also on whether a deterrence function will be served in a particular case. Our conclusion that statutory suppression is applicable and that the violation was not merely technical makes unnecessary any discussion of the third contention.[68]Statutory Suppression is Applicable
 
 
 60
 As to the applicability of statutory suppression to the communications in question here, the Government is in the interesting situation of taking a position diametrically opposite to the one it urged in United States v. Giordano, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974). Understandably it does not press its current position too strongly. In Giordano the Government sought to convince the Court that "unlawfully intercepted" under the statute, 18 U.S.C. § 2518(10)(a)(i), 23 D.C.Code § 551(b)(1), was limited to constitutional violations, as distinguished from statutory violations, 416 U.S. at 525, 94 S.Ct. 1820, whereas here it argues that "unlawfully intercepted" is limited to statutory violations as distinguished from constitutional violations. The Court in Giordano, in rejecting the Government's argument, observed that "(t)he words 'unlawfully intercepted' are themselves not limited to constitutional violations * * * ." Id. at 527, 94 S.Ct. at 1832. It clearly indicated that "unlawfully intercepted" included constitutional as well as statutory violations. Id. at 524-528, 94 S.Ct. 1820.
 
 
 61
 In United States v. Chavez, 416 U.S. 562, 94 S.Ct. 1849, 40 L.Ed. 380 (1974), the Court also interpreted the words "unlawfully intercepted." There, in rejecting an argument that the challenged evidence should be suppressed because of a defect in the intercept order, the Court emphasized that "(t)here is no claim of any constitutional infirmity arising from this defect * * * ." 416 U.S. at 570, 94 S.Ct. at 1854. The Court also stated: "(W)e rejected, in Giordano, the Government's claim that Congress intended 'unlawfully intercepted' communications to mean only those intercepted in violation of constitutional requirements * * * ." Id. at 574, 94 S.Ct. at 1856.
 
 
 62
 Thus the Court in two cases has plainly indicated that "unlawfully intercepted" includes constitutional violations. These indications are reinforced by the language of Title III and the pertinent provisions of the D.C.Code. When Congress wanted to refer only to statutory violations of Title III it said so,[69] whereas no such limiting language is found with respect to the words "unlawfully intercepted."
 
 
 63
 Here the constitutional violation the overbroad entry provision invalidated the warrant, made the seizure thereunder unlawful, and proscribed the admission into evidence of the communications unlawfully intercepted under both relevant constitutional doctrine and the provisions of the statute itself.[70] Thus the suppression order under review is affirmed not only because the warrant was "insufficient on its face," 18 U.S.C. § 2518(10)(a)(ii), 23 D.C.Code § 551(b) (2), as the District Court held, 414 F.Supp. at 885, but also because the communications in suit were "unlawfully intercepted." 18 U.S.C. § 2518(10) (a)(i), 23 D.C.Code § 551(b)(1).
 
 The Violation Was Not Merely Technical
 
 64
 Not every technical or minor deficiency in an intercept order requires seized conversations to be suppressed.[71] The Third Circuit, for example, has concluded that Title III does not call for suppression "for facial insufficiency relating to less critical requirements which may be varied by subsequent affidavits." United States v. Acon, 513 F.2d 513, 518 (3d Cir. 1975). But the same court said:
 
 
 65
 The government certainly would not be allowed to amplify the facts presented on the face of the affidavit to the district court in order to improve the district court's finding of probable cause. United States v. Ceraso, 467 F.2d 647, 653 (3d Cir., 1973).
 
 
 66
 Id. This is an unequivocal rejection of the rule the Government seeks to have adopted in this case. To allow the Government to supplement the showing of probable cause at the point of judicial review would violate the established constitutional principle that probable cause cannot be tested by hindsight but must be examined as of the time the affidavits were presented to the authorizing magistrate and the warrant issued.[72] At that time the entry provision in the warrant here, essentially authorizing unlimited entries on private property, was impermissibly overbroad.[73] There was simply no probable cause showing to support the breadth of the entry provision. This constituted more than a clerical mistake.[74] As a result guidance as to the proper remedy is found in United States v. Giordano, supra, rather than United States v. Chavez, supra, on which the Government chiefly relies.[75]
 
 
 67
 In Giordano the Attorney General had not complied with a statutory requirement that he personally authorize application for a Title III intercept order. Though there was the appearance of compliance with Title III, the Court concluded that the case was within the category where Congress intended statutory suppression, that is, "where there is failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." 416 U.S. at 527, 94 S.Ct. at 1832. Since the order had been issued invalidly, it could not support the conversational seizures.
 
 
 68
 Both the Supreme Court and Congress have indicated that court orders dealing with electronic surveillance must be suitably circumscribed. The Fourth Amendment requires, and Congress has expressed an intent to ensure, that the showing of probable cause match the intrusion contemplated and authorized.[76] There was here, as there was in Giordano, a fault in the required review prior to issuance of the intercept order, although here it was the authorizing judge rather than the Attorney General or his designee who did not fulfill his responsibility. The probable cause shown did not establish the need for the broad authority granted, and the fact that the police may have acted with restraint in executing the warrant cannot legitimate the surveillance. As the Supreme Court stated in a passage directly applicable here:
 
 
 69
 It is apparent that the agents in this case acted with restraint. Yet the inescapable fact is that this restraint was imposed by the agents themselves, not by a judicial officer. * * *
 
 
 70
 Katz v. United States, supra, 389 U.S. at 356, 88 S.Ct. at 514.[77]
 
 
 71
 Our conclusion is that the oral communications seized under the overbroad intercept order in this case must be considered to have been intercepted, as in Giordano, without the authority of a properly issued and suitably circumscribed warrant.[78] Therefore, in addition to the warrant's being "insufficient on its face," 23 D.C.Code § 551(b)(2), (18 U.S.C. § 2518(10)(a)(ii)), the communications are "unlawfully intercepted" within the meaning of 23 D.C.Code § 551(b)(1) (18 U.S.C. § 2518(10)(a)(i)). Since there is no doubt that appellees are statutorily "aggrieved persons,"[79] the order of the District Court suppressing the seized conversations is
 
 
 72
 Affirmed.
 
 
 
 [1]
 The Government predicates jurisdiction on 18 U.S.C. §§ 2518(10)(b) and 3731 (1970). Since the intercept order at issue here and the memorandum and order commanding suppression of the seized evidence, United States v. Ford, 414 F.Supp. 879 (D.D.C.1976), both relied on provisions of the District of Columbia Code, and not on Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520 (1970) (hereinafter Title III), § 2518(10)(b) does not grant the Government a right of appeal. However, we treat the appeal as being validly taken under 18 U.S.C. § 3731 and the provision of the D.C.Code which parallels 18 U.S.C. § 2518(10)(b), 23 D.C.Code § 552 (1973)
 
 
 [2]
 Affidavit of Detective William S. Vislay (hereinafter Vislay affidavit) at 11-17, 20, 22-23, 26-26(a), JA 16-22, 25, 27-28, 31-32. The Vislay affidavit is part of the record in Misc. No. 75-159, In re Oral Intercept. That record was made part of the record on appeal in the instant cases by an order of the District Court entered June 10, 1976, JA 182
 
 
 [3]
 Vislay affidavit at 16, JA 21. People in the neighborhood were, it seems, less than eager to cooperate with the police. The police sought to discover neither instrumentalities nor fruits of crime. They were searching for "mere evidence," but such searches have been found consistent with the Fourth Amendment since Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), so long as they comply with Fourth Amendment standards
 
 
 [4]
 That even non-trespassory interception of oral communications is subject to the strictures of the Fourth Amendment was conclusively established by Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Title III governs interception of wire and oral communications. Section 2516(2) permits states, defined to include the District of Columbia, see § 2510(3), to enact statutes governing wiretapping and interception of oral communications. These statutes must, at a minimum, be as restrictive as the federal statute. See §§ 2515, 2516(2). The provisions of the District of Columbia Code relating to electronic surveillance are contained in 23 D.C.Code §§ 541-556 (1973). These sections are very similar to and were based on the corresponding sections of Title III. See H.R.Rep.No.91-907, 91st Cong., 2d Sess. 77 (1970); S.Rep.No.91-538, 91st Cong., 1st Sess. 18 (1969); 115 Cong.Rec. 19268 (1969) (summary by Sen. Hruska); United States v. Moore, 168 U.S.App.D.C. 227, 231 n.1, 513 F.2d 485, 489 n.1 (1975). The similarity of the statutes and the common origin of the provisions have caused the parties and the court to rely on the legislative history of Title III and cases interpreting it where relevant
 
 
 [5]
 Vislay affidavit at 22, JA 27
 
 
 [6]
 Government br. at 4-5
 
 
 [7]
 The United States Attorney for the District of Columbia had given the approval required by 23 D.C.Code § 546(a). The Assistant United States Attorney and the detective applied to the authorizing judge. See 23 D.C.Code § 541(7)
 
 
 [8]
 A covert breaking and entering had been considered and rejected because of "Watergate overtones." United States v. Ford, supra note 1, 414 F.Supp. at 881
 
 
 [9]
 The questioning was on a transcript and is specifically authorized by 23 D.C.Code § 547(b) (18 U.S.C. § 2518(2)). Statutory minimization is governed by 23 D.C.Code § 547(g) (18 U.S.C. § 2518(5)). See note 11 infra for a discussion of the meaning of statutory minimization
 
 
 [10]
 See 23 D.C.Code § 547(g):
 No order entered under this section may authorize or approve the interception of any wire or oral communication for any period longer than is necessary to achieve the objective of the authorization, nor in any event longer than thirty days. Extensions of an order may be granted, but only upon application for an extension made in accordance with subsection (a) of this section and the court making the findings required by subsection (c) of this section. The period of extension shall be * * * in no event for longer than thirty days. * * *
 Accord, 18 U.S.C. § 2518(5). An extension order was issued by the authorizing judge on September 26, 1975, allowing another 20 days of interception. See note 66 infra.
 
 
 [11]
 23 D.C.Code § 547(g) provides: "Every order and extension thereof shall contain a provision that the authorization to intercept * * * shall be conducted in such a way as to minimize or eliminate the interception of communications not otherwise subject to interception under this subchapter * * *." Accord, 18 U.S.C. § 2518(5). The intercept order authorized monitoring from 6:00 P.M. to 6:00 A.M. only, although on one day (Sept. 16, 1975) the Government pursuant to a showing of probable cause was allowed to extend the permissible hours of interception. United States v. Ford, supra note 1, 414 F.Supp. at 881. The breadth of this particular authorization is not at issue in this case. The statutory minimization provision by its own terms deals with seizure of conversations, not with invasions of privacy entailed by installation, maintenance, or removal of the devices which actually seize the oral or wire communications. But see note 23 infra as to the difficulties inherent in minimization when "bugs" are used
 The authorizing judge may require periodic progress reports on the status of the surveillance. 23 D.C.Code § 547(h) (18 U.S.C. § 2518(6)).
 
 
 [12]
 For example, the National Commission for Review of Federal and State Laws Relating to Wiretapping and Electronic Surveillance (hereinafter National Wiretap Commission) received detailed data about some 1,220 electronic surveillance orders obtained by federal, state, and local law enforcement agencies between 1968 and 1973. Of these only 26 dealt with trespassory bugging. As the Commission noted:
 There are four reasons for the relative disuse of these eavesdropping devices: (1) technical problems in the transmission of signals, (2) the difficulty of developing probable cause, (3) problems associated with surreptitious entry, and (4) the feeling that bugs are more intrusive than telephone taps.
 National Wiretap Commission, Electronic Surveillance 15 (1976) (hereinafter NWC Report). We agree with the Eighth Circuit that those rare instances where surreptitious entry "bugging" is involved require a bifurcated analysis in which each aspect trespass and overhearing is subjected to an independent Fourth Amendment analysis. See United States v. Agrusa, 541 F.2d 690, 696 (8th Cir. 1976).
 
 
 [13]
 See 23 D.C.Code § 547(g): "Every order and extension thereof shall contain a provision that the authorization to intercept shall be executed as soon as practicable * * *." Accord, 18 U.S.C. § 2518(5). "Otherwise there is a danger that the showing of probable cause and the additional information in the application will become stale." S.Rep.No.1097, 90th Cong., 2d Sess. 103 (1968), U.S.Code Cong. & Admin.News 1968, pp. 2112, 2192 (hereinafter Senate Report)
 
 
 [14]
 All appellees are accused of having violated 21 U.S.C. § 846 (1970) by conspiring to distribute and possessing with intent to distribute narcotic drugs. In addition appellee Melvin E. Smith is charged with two counts, and appellees James L. Smith and Jerome Smith with one count each, of distribution of a controlled substance in violation of 21 U.S.C. § 841(a) (1970). Appellee Daniel Haile is charged additionally with possession of a narcotic drug in violation of 33 D.C.Code § 402 (1973)
 
 
 [15]
 23 D.C.Code § 551(b) provides:
 Any aggrieved person in any trial, hearing, or proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States or the District of Columbia, may move to suppress the contents of any intercepted wire or oral communication, or evidence derived therefrom, on the grounds that
 (1) the communication was unlawfully intercepted;
 (2) the order of authorization or approval under which it was intercepted is insufficient on its face;
 (3) the interception was not made in conformity with the order of authorization or approval(.)
 In relevant part this language is identical to that of 18 U.S.C. § 2518(10) (a).
 Under the rules of the District Court for the District of Columbia, a judge who approves a search warrant is never assigned responsibility for the resulting judgment. In this way no judge examines the validity of his own warrant in suppression proceedings.
 
 
 [16]
 United States v. Ford, supra note 1, 414 F.Supp. at 881
 
 
 [17]
 Id
 
 
 [18]
 Id. at 882
 
 
 [19]
 See note 4 supra
 
 
 [20]
 United States v. Ford, supra note 1, 414 F.Supp. at 883. The District Court relied on an oblique reference in the legislative history of Title III:
 A wiretap can take up to several days or longer to install. Other forms or devices may take even longer. * * *
 Senate Report, supra note 13, at 103, U.S.Code Cong. & Admin.News 1968, p. 2192. The court also noted that both the D.C.Code and Title III allow the intercept order to "direct that a communication common carrier, landlord, custodian, or other person shall furnish the applicant forthwith all information, facilities, or technical assistance necessary to accomplish the interception unobtrusively * * *." 23 D.C.Code § 547(f), 18 U.S.C. § 2518(4) (emphasis by the District Court, 414 F.Supp. at 883). The National Wiretap Commission found implication of authority for surreptitious entry eavesdropping in 18 U.S.C. § 2518(4)'s requirement that the intercept order state "the nature and location of the communications facilities as to which, or the place where, authority to intercept is granted." See NWC Report, supra note 12, at 81 (emphasis added). 23 D.C.Code § 547(e) contains substantially the same language.
 Judge MacKinnon has noted:
 Our courts regularly authorize and approve wire tapping, eavesdropping and surreptitious entries * * *. A recent record in this court documents confidential court orders which authorize government agents to "Intercept wire communications * * * (and to) install and maintain an electronic eavesdropping device within the (room of a building at a specific address) to intercept (certain specified) oral communications . . . concerning (certain) described offenses. Installation * * * may be accomplished by any reasonable means, including surreptitious entry or entry by ruse " * * *. * * *
 United States v. Barker, 168 U.S.App.D.C. 312, 345-346, 514 F.2d 208, 241-242 (1975) (en banc ) (dissenting opinion) (emphasis in original). Though we need not reach in this case the issue whether covert entry may be authorized by a court order, we note that the statutory provisions could be read to apply only to the kind of devices which are technically trespassory under the doctrine of Silverman v. United States, 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961), but do not require covert or surreptitious entry for installation. Cf. Irvine v. California, 347 U.S. 128, 74 S.Ct. 381, 98 L.Ed. 561 (1954). Contra, United States v. Agrusa, supra note 12; but see four members of the court dissenting from denial of rehearing en banc, 541 F.2d at 704. See note 65 infra.
 
 
 [21]
 This would seem to be especially true of so-called "knock and notice" statutes. See 18 U.S.C. § 3109 (1970); 23 D.C.Code § 524(a) (1973). See also 23 D.C.Code §§ 522, 523, 524 (1973). In Berger v. New York, 388 U.S. 41, 60, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967), it was suggested that unconsented entry without notice might be permitted on a showing of exigent circumstances, and that one of the defects of the New York law in question was that it did not require such a demonstration prior to issuance of an eavesdropping warrant. Both Title III and the D.C.Code require the authorizing judge to determine, prior to authorizing interception of oral or wire communications, that
 normal investigative procedures have or would have been tried and have or had failed or reasonably appear or appeared to be unlikely to succeed if tried or to be too dangerous(.)
 
 
 [23]
 D.C.Code § 547(c)(3), 18 U.S.C. § 2518(3)(c). Thus under the statutes the applicant for an intercept order must demonstrate a need to avoid notice prior to initiation of the electronic surveillance. It would seem that in light of Berger and the other cases which establish trespassory entry to install, maintain, or remove "bugs" as within the Fourth Amendment's protections, see text at pp. --- - --- of 180 U.S.App.D.C, at pp. 152-158 of 553 F.2d infra, exigency, in terms of impracticability of alternative means, would have to be shown equally for trespassory entries without notice as for incursions on conversational privacy. See United States v. Agrusa, supra note 12, 541 F.2d 690
 
 
 [22]
 The National Wiretap Commission found that:
 Title III contains no provisions which specifically regulate the method by which bugs are to be installed. * * * In some jurisdictions (under parallel state laws) surreptitious entry is authorized by a court order. In other areas, however, police officials have indicated a reluctance to apply for a Title III order to use bugs because of the statute's failure to establish guidelines and procedures.
 NWC Report, supra note 12, at 83 (footnotes omitted). For example, the New York Code of Criminal Procedure requires an eavesdropping warrant to contain "(a)n express authorization to make secret entry upon a private place or premises to install an eavesdropping device, if such entry is necessary to execute the warrant." Section 700.30.8 (McKinney, 1973) (emphasis added). The D.C.Code, like Title III, has no parallel or similar provision.
 
 
 [23]
 Unlike telephone taps, bugs indiscriminately pick up all the sounds in the room or place under surveillance: radio and television broadcasts, air conditioners, squeaking car springs, simultaneous conversations among several people, including innocent background conversations, and so forth. In this welter of random noises the single incriminating conversation often is buried. Bugs, in other words, may "seize" too much for either clear reception or effective minimization. Although law enforcement witnesses before the Commission recognized these problems, there was no evidence that any law enforcement agency had not used a bug because of the difficulty of minimization
 NWC Report, supra note 12, at 15.
 
 
 [24]
 United States v. Ford, supra note 1, 414 F.Supp. at 883. Constitutionally sufficient eavesdrops, if possible, must be undertaken with "adequate judicial supervision or protective procedures." Berger v. New York, supra note 21, 388 U.S. at 60, 87 S.Ct. at 1884
 
 
 [25]
 The Fourth Amendment requires that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." The only information supported by oath or affirmation was that contained in the affidavits filed with the intercept order application and that provided by the authorizing judge's interrogation of Detective Vislay, on a transcript. For a more detailed discussion of this point see note 64 infra
 
 
 [26]
 United States v. Agrusa, supra note 12, 541 F.2d at 696. As Mr. Justice Powell noted in United States v. United States District Court, 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972) (hereinafter Keith ):
 Though physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed, its broader spirit now shields private speech from unreasonable surveillance. * * *
 
 
 [27]
 It is "the discretion to invade private property which we have consistently circumscribed by a requirement that a disinterested party warrant the need to search." Camara v. Municipal Court, 387 U.S. 523, 532-533, 87 S.Ct. 1727, 1733, 18 L.Ed.2d 930 (1967)
 
 
 [28]
 See Katz v. United States, supra note 4, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576
 
 
 [29]
 Camara v. Municipal Court, supra note 27, 387 U.S. at 530-531, 87 S.Ct. at 1732
 The Fourth Amendment protects a right of privacy. This is a right that is increasingly recognized in decisions involving this and other provisions of the Constitution as a core protection safeguarding all citizens against unwarranted intrusions by police and other government officials.
 Dorman v. United States, 140 U.S.App.D.C. 313, 317, 435 F.2d 385, 389 (1970) (en banc ) (footnote omitted). See note 27 supra. Cf. Warden v. Hayden, supra note 3, 387 U.S. at 309-310, 87 S.Ct. at 1651, where the Court said:
 The "mere evidence" limitation has spawned exceptions so numerous and confusion so great, in fact, that it is questionable whether it affords meaningful protection. But if its rejection does enlarge the area of permissible searches, the intrusions are nevertheless made after fulfilling the probable cause and particularity requirements of the Fourth Amendment and after the intervention of a "neutral and detached magistrate . . ." Johnson v. United States, 333 U.S. 10, 14, (68 S.Ct. 367, 369, 92 L.Ed. 436.) The Fourth Amendment allows intrusions upon privacy under these circumstances, and there is no viable reason to distinguish intrusions to secure "mere evidence" from intrusions to secure fruits, instrumentalities, or contraband.
 (Emphasis added.) In Warden v. Hayden the Court, pursuant to a showing of exigent circumstances, sustained the validity of a broad-ranging warrantless search for weapons which involved rummaging throughout the suspect's home. In Camara v. Municipal Court, supra note 27, on the other hand, the Court found that even a "routine inspection of the physical condition of private property" an arguably less hostile intrusion than the typical "search" required prior judicial authorization. 387 U.S. at 530-531, 87 S.Ct. at 1731. These cases can be reconciled only by accepting the premise that, absent compelling circumstances, unconsented warrantless entry into private premises is proscribed by the Fourth Amendment. Cf. United States v. Santana, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976). See notes 47 & 48 infra.
 
 
 [30]
 Camara v. Municipal Court, supra note 27, 387 U.S. at 528, 87 S.Ct. at 1730, quoted with approval in Berger v. New York, supra note 21, 388 U.S. at 53, 87 S.Ct. 1873. To the same effect is Cardwell v. Lewis, 417 U.S. 583, 589, 94 S.Ct. 2464, 2469, 41 L.Ed.2d 325 (1974), quoting Jones v. United States, 357 U.S. 493, 498, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958): "(T)he essential purpose of the Fourth Amendment (is) to shield the citizen from unwarranted intrusions into his privacy." See Warden v. Hayden, supra note 3, 387 U.S. at 304, 87 S.Ct. 1642
 
 
 [31]
 See note 36 infra. In Kaiser v. New York, 394 U.S. 280, 282, 89 S.Ct. 1044, 1046, 22 L.Ed.2d 274 (1969), the Court stated:
 Not until last Term in Katz v. United States, 389 U.S. 347, (88 S.Ct. 507, 19 L.Ed.2d 576), did this Court overrule its prior decisions that the Fourth Amendment encompassed seizures of speech only if the law enforcement officers committed a trespass or at least physically invaded a constitutionally protected area of the speaker. Olmstead v. United States, 277 U.S. 438, (48 S.Ct. 564, 72 L.Ed. 944), explicitly held that wiretapping conducted without such an intrusion was not an unlawful search or seizure. That rule was not modified by Berger v. New York. The Court's discussion of Olmstead in Berger, while recognizing that other cases had negated the statements in Olmstead that conversations are never protected by the Fourth Amendment, cast no doubt upon "(t)he basis of the (Olmstead ) decision" "that the Constitution did not forbid the obtaining of evidence by wiretapping unless it involved actual unlawful entry into the house." Furthermore, the Court in Berger found the overbreadth of N.Y. Code Crim. Proc. § 813-a repugnant to the Fourth Amendment only to the limited extent that it permitted a "trespassory intrusion into a constitutionally protected area."
 Olmstead, then, stated the controlling interpretation of the Fourth Amendment with respect to wiretapping until it was overruled by Katz. * * *
 (Emphasis added; footnotes omitted.) See Wong Sun v. United States, 371 U.S. 471, 485, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963):
 The exclusionary rule has traditionally barred from trial physical, tangible materials obtained either during or as a direct result of an unlawful invasion. It follows from our holding in Silverman v. United States, 365 U.S. 505, (81 S.Ct. 679, 5 L.Ed.2d 734), that the Fourth Amendment may protect against the overhearing of verbal statements as well * * *. * * * Thus, verbal evidence which derives so immediately from an unlawful entry * * * is no less the "fruit" of official illegality than the more common tangible fruits of the unwarranted intrusion. * * *
 (Footnote omitted.) This court has said: "The basic premise of the prohibition against searches * * * was the common-law right of a man to privacy in his home, a right which is one of the indispensable ultimate essentials of our concept of civilization." District of Columbia v. Little, 85 U.S.App.D.C. 242, 245-246, 178 F.2d 13, 16-17 (1949), aff'd on other grounds, 339 U.S. 1, 70 S.Ct. 468, 94 L.Ed. 599 (1950), cited approvingly in Camara v. Municipal Court, supra note 27, 387 U.S. at 530, 87 S.Ct. 1727.
 
 
 [32]
 By surreptitious entry we mean either entry by ruse or stratagem or covert entry
 The protections of the Fourth Amendment are not limited to homes. As the Supreme Court has stated:
 What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. * * * But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected. * * *
 Katz v. United States, supra note 4, 389 U.S. at 351-352, 88 S.Ct. at 511. Moreover, in See v. City of Seattle, 387 U.S. 541, 543, 87 S.Ct. 1737, 1739, 18 L.Ed.2d 943 (1967), the Court stated:
 In Go-Bart Importing Co. v. United States, 282 U.S. 344, (51 S.Ct. 153, 75 L.Ed. 374); Amos v. United States, 255 U.S. 313, (41 S.Ct. 266, 65 L.Ed. 654); and Silverthorne Lumber Co. v. United States, 251 U.S. 385, (40 S.Ct. 182, 64 L.Ed. 319), this Court refused to uphold otherwise unreasonable criminal investigative searches merely because commercial rather than residential premises were the object of the police intrusions. Likewise, we see no justification for so relaxing Fourth Amendment safeguards where the official inspection is intended to aid enforcement of laws prescribing minimum physical standards for commercial premises. As we explained in Camara, a search of private houses is presumptively unreasonable if conducted without a warrant. The businessman, like the occupant of a residence, has a constitutional right to go about his business free from unreasonable official entries upon his private commercial property. The businessman, too, has that right placed in jeopardy if the decision to enter and inspect for violation of regulatory laws can be made and enforced by the inspector in the field without official authority evidenced by a warrant.
 (Emphasis added.) To the same effect is Mancusi v. DeForte, 392 U.S. 364, 367-370, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968). See Lanza v. New York, 370 U.S. 139, 143, 82 S.Ct. 1218, 8 L.Ed.2d 384 (1962); United States v. Rosenberg, 416 F.2d 680 (7th Cir. 1969).
 
 
 [33]
 The device was a microphone connected to police monitors by wire, not a wireless transmitter of the kind employed here; we do not believe this alters the constitutional principle at stake. The intrusions are indistinguishable
 
 
 [34]
 Though Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949), had protected the "security of one's privacy against arbitrary intrusion by the police," Irvine v. California, supra note 20, 347 U.S. at 132-133, 74 S.Ct. at 383, it had not applied the exclusionary rule to state crimes tried in state courts. But see Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Moreover, it was not clear that the Fourteenth Amendment's due process clause embodied the same standard of reasonableness as the Fourth Amendment. But see Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963). The Irvine case did not fall within the exclusionary rule of Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), because there had been no coercion, violence, or brutality to the person
 
 
 [35]
 Dissenting in Irvine, Mr. Justice Frankfurter, the author of Wolf, wrote:
 There was lacking here physical violence, even to the restricted extent employed in Rochin. We have here, however, a more powerful and offensive control over the Irvines' life than a single, limited physical trespass. Certainly the conduct of the police here went far beyond a bare search and seizure. * * * Those affirming the conviction find that this conduct, in its entirety, is "almost incredible if it were not admitted." Surely the Court does not propose to announce a new absolute, namely, that even the most reprehensible means for securing a conviction will not taint a verdict so long as the body of the accused was not touched by State officials. * * *
 347 U.S. at 145-146, 74 S.Ct. at 390. While a ruse entry such as the one used in this case may not be a breaking and entering, see United States v. Phillips, 497 F.2d 1131 (9th Cir. 1974), the Fourth Amendment's protection extends equally to ruse entries. Id. Therefore, that difference is not meaningful for determining whether the entries at issue here are within the proscriptions of the Fourth Amendment. See also United States v. Ressler, 536 F.2d 208, 211-212 (7th Cir. 1976).
 
 
 [36]
 In Goldman v. United States, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322 (1942),
 the Court found that the use of a detectaphone placed against an office wall in order to hear private conversations in the office next door did not violate the Fourth Amendment because there was no physical trespass in connection with the relevant interception. * * *
 Berger v. New York, supra note 21, 388 U.S. at 51, 87 S.Ct. at 1879 (emphasis added). The same factor was operative in Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928), where
 the interception of Olmstead's telephone line was accomplished without entry upon his premises and was, therefore, found not to be proscribed by the Fourth Amendment. The basis of the decision was that the Constitution did not forbid the obtaining of evidence by wiretapping unless it involved actual unlawful entry into the house. * * *
 Berger v. New York, supra note 21, 388 U.S. at 51, 87 S.Ct. at 1879. Both Goldman and Olmstead were overruled by Katz v. United States, supra note 4, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576. See text at pp. --- - --- of 180 U.S.App.D.C., at pp. 157-158 of 553 F.2d infra.
 
 
 [37]
 At this point in our inquiry the fact that the police in this case had a warrant is irrelevant. The Government's contention is precisely that surreptitious entries would have been valid without independent judicial authorization. The effect of the warrant issued in this case is discussed in text at pp. --- - --- of 180 U.S.App.D.C., at pp. 165-170 of 553 F.2d infra
 
 
 [38]
 All that was heard through the microphone was what an eavesdropper, hidden in the hall, the bedroom, or the closet, might have heard." Irvine v. California, supra note 20, 347 U.S. at 131, 74 S.Ct. at 382
 
 
 [39]
 Osborn v. United States, 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966), involved two separate "entries" by a police agent. Judicial authorization was sought and given for the agent to tape record a conversation he expected to have with the petitioner, who was suspected of jury tampering. The meeting was held, but the recorder malfunctioned. Judicial authorization was given for a second use of the tape recorder, and this time the incriminating statements of the petitioner were recorded. Noting the two separate instances of judicial approval, the Court allowed the recording of the second meeting to be introduced into evidence. See 385 U.S. at 329 n.6, 87 S.Ct. 429
 The Court's later characterization of Osborn as the kind of case where suitably precise and discriminate procedures were used, see Berger v. New York, supra note 21, 388 U.S. at 57, 87 S.Ct. 1873, can be understood only in terms of an assumption that unconsented entry to accomplish recording of conversations must be judicially approved. See also Alderman v. United States, 394 U.S. 165, 177-180, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969); Wong Sun v. United States, supra note 31, 371 U.S. at 485, 83 S.Ct. 407. Cf. Lopez v. United States, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963); and Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966) (decided the same day as Osborn ), where the Court established that speakers took the risk of their listeners' later divulging the contents of conversations, at least where the listeners' presence was the result of actual or implied invitations. See Alderman v. United States, supra, 394 U.S. at 179 n.11, 89 S.Ct. 961, and cases cited at note 35 supra.
 
 
 [40]
 388 U.S. at 45, 87 S.Ct. 1873. See note 21 supra
 
 
 [41]
 See, e. g., notes 31 & 36 supra
 
 
 [42]
 388 U.S. at 57, 87 S.Ct. 1873
 
 
 [43]
 This court has said that Katz and Keith recognized that
 the Fourth Amendment is a bulwark against unreasonable governmental intrusion by non-trespassory as well as by trespassory means; both the spirit and the history of that Amendment demonstrate that there is a legitimate expectation that one's conversations no less than one's home are to be sheltered by the full panoply of Fourth Amendment safeguards. * * *
 Zweibon v. Mitchell, 170 U.S.App.D.C. 1, 40, 516 F.2d 594, 633 (1975) (en banc ), cert. denied, 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 187 (1976) (emphasis added). See, e. g., Amsterdam, Perspectives on the Fourth Amendment, 58 Minn.L.Rev. 349, 385 (1974).
 And as recently as last term the Supreme Court reaffirmed the validity of the concept of "constitutionally protected areas." In rejecting the argument that bank records obtained by an invalid subpoena were to be suppressed, the Court found both that "there was no intrusion into any area in which respondent had a protected Fourth Amendment interest" and that respondent had no legitimate expectation of privacy as to the bank records. United States v. Miller, 425 U.S. 435, 440-443, 96 S.Ct. 1619, 1622, 48 L.Ed.2d 71 (1976). This analysis can only be read to reflect a refutation of the Government's argument that trespasses are irrelevant to Fourth Amendment analysis when ancillary to electronic surveillance. The Amendment protects people by protecting certain expectations of privacy which relate to private physical areas as well as conversations.
 See United States v. Ehrlichman, 178 U.S.App.D.C. 149, 173, 546 F.2d 910, 939 (1976) (Leventhal, J., concurring). We do not read Judge Wilkey's language in the companion case of United States v. Barker, 178 U.S.App.D.C. 174, 546 F.2d 940 (1976), as being opposed to our conclusion. On the contrary, we believe it supports our finding that entry for the purpose of installing, maintaining, or removing "bugging" equipment must be tested by traditional Fourth Amendment standards. Though it is Judge Wilkey's view that a nontrespassory electronic surveillance may, under certain circumstances, be more intrusive than a standard trespassory search, at 186-187 n.39, 546 F.2d at 952-953 n.39, he notes:
 Court-ordered surveillances are sometimes trespassory, sometimes not, depending on the requirements of the situation * * * .
 * * * Of course, if a trespass is not necessary in a particular case to effect an eavesdrop, the court need not gratuitously authorize a surreptitious entry * * * .
 At 186 n.40, 546 F.2d at 953 n.40. Judge Wilkey argues for establishing an equivalency between "(u)npermitted physical entry into a citizen's dwelling (which) is no doubt the core of the Fourth Amendment prohibition against unreasonable searches and seizures," at 187, 546 F.2d at 953, and non-trespassory electronic surveillance. Even if one accepts that premise, see Alderman v. United States, supra note 39, 394 U.S. at 179 n.11, 89 S.Ct. 961, it would seem that when both elements of the equivalency, or equation, are present, each must be tested for compliance with applicable constitutional and statutory requirements.
 
 
 [44]
 Alderman v. United States, supra note 39
 
 
 [45]
 The view that every search must be tested solely by a standard of reasonableness has been repeatedly rejected. See Keith, supra note 26, 407 U.S. at 315 n.16, 92 S.Ct. 2125; Chimel v. California, 395 U.S. 752, 764-765, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); Zweibon v. Mitchell, supra note 43, 516 F.2d at 630-632, quoting from Cady v. Dombrowski, 413 U.S. 433, 439, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973)
 As the Supreme Court stressed in Chambers v. Maroney, 399 U.S. 42, 51, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419 (1970):
 In enforcing the Fourth Amendment's prohibition against unreasonable searches and seizures, the Court has insisted upon probable cause as a minimum requirement for a reasonable search permitted by the Constitution. As a general rule, it has also required the judgment of a magistrate on the probable-cause issue and the issuance of a warrant before a search is made. Only in exigent circumstances will the judgment of the police as to probable cause serve as a sufficient authorization * * *. * * *
 (Emphasis added.) See, e. g., Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); Chimel v. California, supra.
 For this reason we reject the Government's suggestion that we analogize the present case to those instances where courts have upheld warrantless entry onto third-party premises for the purpose of executing arrest warrants. See, e. g., United States v. Brown, 151 U.S.App.D.C. 365, 467 F.2d 419 (1972). In Brown the court relied on Dorman v. United States, supra note 29, in which warrantless entry to effect arrest was held permissible in those precisely defined circumstances which essentially embody the meaning of exigency. We said:
 Terms like "exigent circumstances" or "urgent need" are useful in underscoring the heavy burden on the police to show that there was a need that could not brook the delay incident to obtaining a warrant * * *. * * *
 435 F.2d at 392. We further stated:
 The courts have always recognized the case of arrest as a case involving its own considerations.
 Id. at 319, 435 F.2d at 391. Accord, United States v. Watson, 423 U.S. 411, 426-433, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976) (Powell, J., concurring). This is not only because prompt arrest might lead to recovery of fruits and instrumentalities of the crime, 140 U.S.App.D.C. at 319, 435 F.2d at 391; cf. Warden v. Hayden, supra note 3, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782; but also because by the time the police have obtained a warrant the suspect may be aware of the pursuit and may, for that or other reasons, be on the verge of flight. See Chimel v. California, supra, 395 U.S. at 778-781, 89 S.Ct. 2034 (White, J., dissenting). Another reason for allowing warrantless entry is that "under Chimel the police can enter only into those portions of the property in which entry is necessary to effect the arrest." Coolidge v. New Hampshire, supra, 403 U.S. at 518, 91 S.Ct. at 2064 (White, J., dissenting).
 Therefore, the ratio decidendi of Brown is not persuasive in the present case. Though the court did not specifically refer to exigency, it is clear that the very involvement of arrest provides some urgency, see Chimel v. California, supra, 395 U.S. at 781, 89 S.Ct. 2034 (White, J., dissenting), and that there were present in Brown certain facts (a number of previous efforts to effect arrest) which are absent here and which contributed to compelling need.
 We note that the Third Circuit has adopted essentially the same view of the meaning of Brown. Emphasizing the possibility of escape, and reading Brown to require both probable cause and exigent circumstances, the court followed our Brown decision. Fisher v. Volz, 496 F.2d 333, 341 (3d Cir. 1974). A later case in the Third Circuit also required probable cause and the kind of exigent circumstances we described in Dorman to justify warrantless police entry into third-party premises, even when undertaken for the limited purpose of arrest. Government of the Virgin Islands v. Gereau, 502 F.2d 914 (3d Cir. 1974), cert. denied, 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839 (1975). See also United States v. McKinney, 379 F.2d 259 (6th Cir. 1967), Rice v. Wolff, 513 F.2d 1280 (8th Cir. 1975), rev'd on other grounds, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), cited by the Government, is not opposed to our analysis since the court there stated that in a Brown situation there must at a minimum be probable cause and, finding none, did not reach the issue of urgent need.
 Another case cited by the Government, United States v. Phillips, supra note 35, is similarly inapposite. In Phillips the court reiterated at its earlier conclusion that ruse entries, because they do not involve breaking and entering, do not violate 18 U.S.C. § 3109 (1970) even if undertaken without notice of authority and purpose. See note 21 supra. From this the Government argues that a ruse entry can be likened to consented entry which is not subject to the warrant requirement of the Fourth Amendment. See, e. g., Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). But the Government's proposition was unambiguously rejected by the Phillips court:
 To be valid, a consent must be intelligently and knowingly given. Before a person can be deemed to have "knowingly" consented, he must be aware of the purpose for which the agent is seeking entry. * * * A ruse entry, by its very nature, runs contra to the concept of an intelligent consent or waiver.
 497 F.2d at 1135 n.4. See Katz v. United States, supra note 4, 389 U.S. at 358 n.22, 88 S.Ct. 507, quoted at note 56 infra. See also United States v. Ressler, supra note 35.
 As the Supreme Court admonished in Johnson v. United States, 333 U.S. 10, 17, 68 S.Ct. 367, 370-371, 92 L.Ed. 436 (1948):
 An officer gaining access to private living quarters under color of his office and of the law which he personifies must then have some valid basis in law for his intrusion. Any other rule would undermine "the right of the people to be secure in their persons, houses, papers, and effects," and would obliterate one of the most fundamental distinctions between our form of government, where officers are under the law, and the police-state where they are the law.
 (Footnote omitted.) In the absence of exigent circumstances, this "basis in law" must be exemplified by a warrant. See notes 47 & 48 infra.
 
 
 [46]
 See notes 26 & 43 supra
 
 
 [47]
 Almeida-Sanchez v. United States, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973) (Powell, J., concurring); Katz v. United States, supra note 4, 389 U.S. at 357-358, 88 S.Ct. 507; United States v. Carter, 173 U.S.App.D.C. 54, 61-65, 522 F.2d 666, 673-677 (1975); note 57 infra. In Katz the Supreme Court stressed:
 Searches conducted without warrants have been held unlawful "notwithstanding facts unquestionably showing probable cause," * * * for the Constitution requires "that the deliberate, impartial judgment of a judicial officer . . . be interposed between the citizen and the police. . . ." * * * "Over and again this Court has emphasized that the mandate of the (Fourth) Amendment requires adherence to judicial processes," * * * and that searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment subject only to a few specifically established and well-delineated exceptions.
 389 U.S. at 357, 88 S.Ct. at 514 (footnotes omitted). This was described in Coolidge v. New Hampshire, supra note 45, 403 U.S. at 455, 91 S.Ct. at 2032, as the "most basic constitutional rule in this area." In United States v. Carter, supra, this court stated in strong terms that a warrantless search of a private dwelling is per se unreasonable in the absence of one or more "exigent circumstances," none of which is present here.
 Recent Supreme Court cases holding the warrant requirement inapplicable in certain very limited situations cannot be read as evincing an intent to change this well established rule. In United States v. Martinez-Fuerte, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), for example, the Court found that routine and brief questioning conducted at permanent checkpoints near United States borders was not subject to the warrant requirement. The Court based its conclusion on three distinct factors; (1) the questioning entailed minor interference with privacy; (2) the permanent checkpoints were a visible manifestation of the officers' authority to conduct the brief questioning and provided a sufficient means for determining the lawful power to search and whether the officers were acting under proper authorization; and (3) the reasonableness of the search or seizure was not susceptible of coloration by hindsight since the determinative factors location and procedures were uniform and amenable to subsequent review. The Court distinguished the intrusion upon privacy from that which obtains when officers search a home or other private dwelling, and that difference is itself sufficient to take the present case outside the ambit of Martinez-Fuerte. The other factors cited by the Court are similarly inapplicable. Here, given the lack of notice at the time of the search, a warrant or other recorded authorization is the only means by which the reviewing court or the persons subjected to the invasion of privacy can determine whether the officers acted under proper authorization and within the limits of their authority. Furthermore, the almost limitless number of possibilities existing as to number and manner of entries would require, in the absence of a warrant, that each search be individually tested as to reasonableness in a way that would almost surely be colored by hindsight. See Zweibon v. Mitchell, supra note 43, 170 U.S.App.D.C. 1, 37-38 n.91, 39-40 n.94, 516 F.2d at 630-631 n.91, 632-633 n.94, where this court distinguished, in an analogous situation, other cases finding the warrant requirement inapplicable.
 In rejecting subsequent review as to the second aspect of the search in domestic security surveillances, the Supreme Court in Keith, supra note 26, said:
 (P)ost-surveillance review would never reach the surveillances which failed to result in prosecutions. Prior review by a neutral and detached magistrate is the time-tested means of effectuating Fourth Amendment rights. Beck v. Ohio, 379 U.S. 89, 96, 85 S.Ct. 223, 228, 13 L.Ed.2d 142 (1964).
 407 U.S. at 318, 92 S.Ct. at 2137. It is our conclusion that that logic is equally applicable to the trespassory aspect of electronic eavesdropping. See Katz v. United States, supra note 4, 389 U.S. at 356, 88 S.Ct. 507.
 
 
 [48]
 Probable cause is, as a general rule, insufficient to justify warrantless invasions of protected privacy. See, e. g., Coolidge v. New Hampshire, supra note 45, 403 U.S. at 451, 91 S.Ct. 2022; Jones v. United States, supra note 30, 357 U.S. at 497-498, 78 S.Ct. 1253; Agnello v. United States, 269 U.S. 20, 33, 46 S.Ct. 4, 70 L.Ed. 145 (1925); Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920). See note 49 infra
 (T)his Court "has never sustained a search upon the sole ground that officers reasonably expected to find evidence of a particular crime and voluntarily confined their activities to the least intrusive means consistent with that end." Katz, supra, at 356-357 (88 S.Ct. at 514, 19 L.Ed.2d 576). The Fourth Amendment contemplates a prior judicial judgment, not the risk that executive discretion may be reasonably exercised. * * *
 Keith, supra note 26, 407 U.S. at 317, 92 S.Ct. at 2137 (footnote omitted).
 Though certain recent cases, see, e. g., Keith, supra note 26, 407 U.S. at 314-323, 92 S.Ct. 2125; Camara v. Municipal Court, supra note 27, have established the proposition that in certain circumstances the required showing of probable cause will differ from that prevailing for "ordinary" search warrants, these cases have not retreated from the warrant requirement. In both Keith and Camara the Court refused to depart from the general rule that the magistrate must determine that the required showing has been made and issue a warrant before the intrusion is undertaken. See Almeida-Sanchez v. United States, supra note 47 (Powell, J., concurring); Chambers v. Maroney, supra note 45, 399 U.S. at 51, 90 S.Ct. 1975; Zweibon v. Mitchell, supra note 43, 516 F.2d at 630-633.
 Pursuant to Rule 8(g) of the General Rules of this court, the Government, after oral argument in this case, brought to our attention United States v. Altese, No. 75-CR-341 (E.D.N.Y., decided Oct. 14, 1976). The procedure utilized by the Government agents, and approved by the court, in that case supports the conclusion we reach. In Altese the batteries powering the surreptitiously installed listening devices failed and a second entry became a prerequisite to continued monitoring of conversations. The Special Attorney in charge of the investigation appeared before a District Judge and obtained specific authorization, in the form of a second warrant issued on probable cause, for agents to make the required entry into the premises for the sole purpose of repairing the malfunctioning "bugs." Here when the "bugs" malfunctioned the police re-entered the premises without obtaining a second warrant authorizing that entry. But cf. United States v. London, 424 F.Supp. 556 (D.Md. 1976).
 
 
 [49]
 See, e. g., United States v. Edwards, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974), and United States v. Robinson, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), discussed in Zweibon v. Mitchell, supra note 43, 516 F.2d at 628-629 n.89; Chambers v. Maroney, supra note 45; Chimel v. California, supra note 45; Dorman v. United States, supra note 29; notes 45 & 47 supra and note 56 infra
 
 
 [50]
 The validity of this methodology was reaffirmed in Keith, supra note 26:
 (T)he question is whether the needs of citizens for privacy and free expression may not be better protected by requiring a warrant before such surveillance is undertaken. We must also ask whether a warrant requirement would unduly frustrate the efforts of Government * * *.
 407 U.S. at 315, 92 S.Ct. at 2135. Since it is not questioned that the privacy interests threatened by unrestrained entries for the purpose of placing or maintaining "bugs" would be better protected by a warrant requirement, we have limited our discussion to the second question.
 
 
 [51]
 As the Supreme Court stated in Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968):
 The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge * * *. * * *
 (Footnote omitted.) Cf. Keith, supra note 26, 407 U.S. at 318-321, 92 S.Ct. 2125; Zweibon v. Mitchell, supra note 43, 516 F.2d at 645-646.
 
 
 [52]
 In support of its contention that the entry provision was surplusage and should not be required, the Government argues that an entry of private premises to set "bugs" is a "limited invasion of a citizen's privacy." Government reply br. at 8-9. The Government cites this court to certain language in Coolidge v. New Hampshire, supra note 45, 403 U.S. at 467, 91 S.Ct. at 2038, to the effect that "the problem is not that of intrusion per se, but of a general, exploratory rummaging in a person's belongings." This quotation is taken out of context, however. In describing the "two distinct constitutional protections served by the warrant requirement" the Court stated:
 First, the magistrate's scrutiny is intended to eliminate altogether searches not based on probable cause. The premise here is that any (emphasis in original) intrusion in the way of search or seizure is an evil, so that no intrusion at all is justified without a careful prior determination of necessity. * * * The second, distinct objective is that those searches deemed necessary should be as limited as possible. Here, the specific evil is the "general warrant" abhorred by the colonists, and the problem is not that of intrusion per se, but of a general, exploratory rummaging in a person's belongings. * * *
 403 U.S. at 467, 91 S.Ct. at 2038 (emphasis added).
 While it is true that the particularity clause of the Fourth Amendment was intended to prevent rummaging searches, the reach of the Amendment cannot turn upon whether police do in fact proceed to make such a search. See Alderman v. United States, supra note 39, 394 U.S. at 177-180, 89 S.Ct. 961. See also Andresen v. Maryland, 427 U.S. 463, 478, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976), where the Court reiterated that the specific prohibition on "general warrants" is intended to prevent rummaging searches. But as the above quotation from Coolidge clearly indicates, when looked at in context the reach of the Fourth Amendment is considerably broader.
 It is the individual's interest in privacy which the Amendment protects, and that would not appear to fluctuate with the "intent" of the invading officers. * * *
 Zweibon v. Mitchell, supra note 43, 170 U.S.App.D.C. at 56 n.173, 516 F.2d at 649 n.173, quoting Abel v. United States, 362 U.S. 217, 255, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960) (Brennan, J., dissenting), which was cited approvingly in Camara v. Municipal Court, supra note 27, 387 U.S. at 530, 87 S.Ct. 1727. Therefore, the Government's contention must be rejected.
 
 
 [53]
 See notes 27, 29-31, 52 supra; Alderman v. United States, supra note 39, 394 U.S. at 177-180, 89 S.Ct. 961, and cases cited therein
 
 
 [54]
 "Title III has as its dual purpose (1) protecting the privacy of wire and oral communications, and (2) delineating on a uniform basis the circumstances and conditions under which the interception of wire and oral communications may be authorized. To assure the privacy of oral and wire communications, title III prohibits all wiretapping and electronic surveillance by persons other than duly authorized law enforcement officers, * * * and only that after authorization of a court order obtained after a showing and finding of probable cause." S.Rep.No.1097, 90th Cong., 2d Sess., 66 (1968), U.S.Code Cong. & Admin.News 1968, p. 2153
 Gelbard v. United States, 408 U.S. 41, 48, 92 S.Ct. 2357, 2361, 33 L.Ed.2d 179 (1972) (emphasis added.) "New protections for privacy must be enacted." Id. at 49 n.7, 92 S.Ct. at 2361, quoting S.Rep.No.1097 (emphasis by the Court).
 As noted above, see note 20 supra, it is not clear that Congress intended to permit surreptitious entry eavesdropping under Title III. What is certain is that there was a desire to circumscribe the extent to which electronic surveillance could be undertaken without authority of a valid court order issued on sufficient probable cause and to create new protections for privacy. Therefore, it would be somewhat incongruous to conclude that Congress intended to diminish in any way the traditional protections the Fourth Amendment provides against unwarranted intrusions into the home or office.
 
 
 [55]
 While 18 U.S.C. § 2518(7) (1970) permits 48 hours to elapse between initiation of an "emergency" wiretap or oral surveillance and obtaining of a validating court order, the parallel provision in 23 D.C.Code § 548 allows only 12 hours because
 (i)t was of the opinion of the District Court Committee that, regardless of the day or hour, in this uniformly urban jurisdiction of the District of Columbia, a judicial officer can always be reached within 12 hours' time. * * *
 S.Rep.No.91-538, supra note 4, at 22. This legislative finding casts serious doubt on the unsupported assertion, made by the Government at oral argument, that it might be impossible to secure prior judicial approval for surreptitious entries because of unavailability of judicial personnel. Furthermore, in this case the Assistant United States Attorney not only had sufficient time, but did contact the authorizing judge prior to the second entry. He did not, however, seek a new warrant issued on probable cause, supported by oath or affirmation.
 
 
 [56]
 In discussing the method by which the entries and "seizures" of conversations had been accomplished in Osborn v. United States, supra note 39, the Court declared:
 There could hardly be a clearer example of " 'the procedure of antecedent justification before a magistrate that is central to the Fourth Amendment' " as "a precondition of lawful electronic surveillance."
 385 U.S. at 330, 87 S.Ct. at 433 (footnote omitted). One year later the Court was asked to exempt non-trespassory electronic surveillance from the warrant requirement. Noting that it had previously authorized warrantless searches in certain instances, the Court replied:
 It is difficult to imagine how any of those exceptions could ever apply to the sort of search and seizure involved in this case. Even electronic surveillance substantially contemporaneous with an individual's arrest could hardly be deemed an "incident" of that arrest. 20 Nor could the use of electronic surveillance without prior authorization be justified on grounds of "hot pursuit." 21 And, of course, the very nature of electronic surveillance precludes its use pursuant to the suspect's consent. 22
 
 
 [20]
 In Agnello v. United States, 269 U.S. 20, 30, 46 S.Ct. 4, 70 L.Ed. 145, the Court stated:
 "The right without a search warrant contemporaneously to search persons lawfully arrested while committing crime and to search the place where the arrest is made in order to find and seize things connected with the crime as its fruits or as the means by which it was committed, as well as weapons and other things to effect an escape from custody, is not to be doubted."
 Whatever one's view of "the long-standing practice of searching for other proofs of guilt within the control of the accused found upon arrest," United States v. Rabinowitz, 339 U.S. 56, 61, (70 S.Ct. 430, 433, 94 L.Ed. 653); cf. id., at 71-79, (70 S.Ct. at 437-441) (dissenting opinion of Mr. Justice Frankfurter), the concept of an "incidental" search cannot readily be extended to include surreptitious surveillance of an individual either immediately before, or immediately after, his arrest.
 
 
 [21]
 Although "(t)he Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others," Warden v. Hayden, 387 U.S. 294, 298-299, (87 S.Ct. 1642, 1646, 18 L.Ed.2d 782), there seems little likelihood that electronic surveillance would be a realistic possibility in a situation so fraught with urgency
 
 
 [22]
 A search to which an individual consents meets Fourth Amendment requirements, Zap v. United States, 328 U.S. 624, (66 S.Ct. 1277, 90 L.Ed. 1477), but of course "the usefulness of electronic surveillance depends on lack of notice to the suspect." Lopez v. United States, 373 U.S. 427, 463, (83 S.Ct. 1381, 1401, 10 L.Ed.2d 462) (dissenting opinion of Mr. Justice Brennan)
 Katz v. United States, supra note 4, 389 U.S. at 357-358, 88 S.Ct. at 514-515 (emphasis added). Cf. United States v. Bernstein, 509 F.2d 996, 1003 (4th Cir. 1975). See Gelbard v. United States, supra note 54:
 Title III authorizes the interception of private wire and oral communications, but only when law enforcement officials are investigating specified serious crimes and receive prior judicial approval * * *. * * *
 * * * (T)he fundamental policy adopted by Congress on the subject of wiretapping and electronic surveillance * * * is strictly to limit the employment of those techniques of acquiring information(.)
 408 U.S. at 46-47, 92 S.Ct. 2360. Since surreptitious entries of the kind involved in this case have, we are told, as their sole and limited purpose enabling of electronic surveillance, there seems to be no reasonable way in which they can be characterized as of greater urgency than the electronic surveillance they enable. It is conceivable that such an entry might be necessary to implement the "emergency" electronic surveillance apparently authorized by 18 U.S.C. § 2518(7) (23 D.C.Code § 548). Whether an "exigency" exception from the warrant requirement would be called for in such a case is clearly beyond the scope of the present case.
 
 
 [57]
 As Mr. Justice Powell, speaking for the Court in Keith, supra note 26, phrased it:
 The warrant clause of the Fourth Amendment is not dead language. Rather, it has been
 "a valued part of our constitutional law for decades, and it has determined the result in scores and scores of cases in courts all over this country. It is not an inconvenience to be somehow 'weighed' against the claims of policy efficiency. It is, or should be, an important working part of our machinery of government, operating as a matter of course to check the 'well-intentioned but mistakenly overzealous executive officers' who are a part of any system of law enforcement." Coolidge v. New Hampshire, 403 U.S., at 481, (91 S.Ct. at 2046).
 See also United States v. Rabinowitz, (339 U.S. 56 (1950),) at 68, (70 S.Ct. at 445) (Frankfurter, J., dissenting); Davis v. United States, 328 U.S. 582, 604, (66 S.Ct. 1256, 1266, 90 L.Ed. 1453) (1946) (Frankfurter, J., dissenting).
 Over two centuries ago, Lord Mansfield held that common-law principles prohibited warrants that ordered the arrest of unnamed individuals who the officer might conclude were guilty of seditious libel. "It is not fit," said Mansfield, "that the receiving or judging of the information should be left to the discretion of the officer. The magistrate ought to judge; and should give certain directions to the officer." Leach v. Three of the King's Messengers, 19 How.St.Tr. 1001, 1027 (1765).
 407 U.S. at 315-316, 92 S.Ct. at 2136 (emphasis in original).
 
 
 [58]
 Surreptitious entry of private premises, in addition to being a naked invasion of privacy in its most offensive form, is also fraught with physical even mortal danger for both the occupants of the private premises and the police. The occupants, on discovering the unidentified intruders, may attempt to shoot them, and the police will doubtless return the fire. This danger was one of the reasons for enactment of 18 U.S.C. § 3109 requiring knocking and notice to occupants before entry to execute a search warrant. Sabbath v. United States, 391 U.S. 585, 588-590, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968). Certainly a judge, in authorizing a surreptitious entry, should consider this danger and specify in the warrant to what extent, if at all, the surreptitious entrants may be armed
 
 
 [59]
 See, e. g., Whitley v. Warden, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971); Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). The first part of the traditional test is that
 in determining whether probable cause exists for issuance of a search warrant * * * it is necessary to determine whether the affiant has reasonable grounds, at the time of making the affidavit and the issuance of the warrant, for believing that "the offense charged" was being or had been committed. * * *
 United States v. Brouillette, 478 F.2d 1171, 1176 (5th Cir. 1973). Camara v. Municipal Court, supra note 27, and Keith, supra note 26, and, more recently, Almeida-Sanchez v. United States, supra note 47 (Powell, J., concurring), have recognized that a warrant might issue on other than traditional probable cause in certain circumstances. However, our concern in this case is with the breadth of the authorization; therefore, we do not address appellees' contention that a more rigorous degree of probable cause must be demonstrated for surreptitious entry than for a traditional search.
 The Fourth Amendment also requires that a warrant be suitably tailored to demonstration of probable cause:
 (B)ypassing a neutral predetermination of the scope of a search leaves individuals secure from Fourth Amendment violations "only in the discretion of the police." * * *
 Katz v. United States, supra note 4, 389 U.S. at 358-359, 88 S.Ct. at 515, quoting from Beck v. Ohio, 379 U.S. 89, 97, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964) (emphasis in original). In Camara v. Municipal Court, supra note 27, the Court declared:
 If a valid public interest justifies the intrusion contemplated, then there is probable cause to issue a suitably restricted search warrant. * * *
 387 U.S. at 539, 87 S.Ct. at 1736 (emphasis added). And Mr. Justice Stewart has stated:
 The need for particularity and evidence of reliability in the showing required when judicial authorization is sought for the kind of electronic eavesdropping involved in this case is especially great. The standard of reasonableness embodied in the Fourth Amendment demands that the showing of justification match the degree of intrusion. * * *
 Berger v. New York, supra note 21, 388 U.S. at 69, 87 S.Ct. at 1888 (concurring opinion) (emphasis added). Finally, the following exchange between Senator McClellan, author of S. 917, the predecessor to Title III, and Senator Lausche is informative:
 Mr. LAUSCHE. Is the bill as now written by the committee predicated upon the same principle as that contained in support of the provisions of the Constitution of the United States, which holds that the home of an individual shall be inviolate against search except when there is issued such authority by a competent court to make a search built upon evidence supporting the issuance of that authority?
 Mr. McCLELLAN. Completely so, let me say to my friend. Completely so, and it is even more restrictive. We have gone to every length which is proper, we think, to protect people's privacy. Today individual privacy is being promiscuously invaded all over the country. The law is weak. * * *
 
 
 [114]
 Cong.Rec. 14470 (1968) (emphasis added). As is developed more fully in text, in this case the demonstrated and cognizable needs of the applicant simply did not warrant issuance of an order with the breadth found in the surreptitious entry provision
 
 
 [60]
 Reliance is also placed on the legislative recognition that (a) wiretap can take up to several days or longer to install. Other forms or devices may take even longer. * * *
 Senate Report, supra note 13, at 103, U.S.Code Cong. & Admin.News 1968, p. 2192. However, this language is contained in the comment to § 2518(5), which establishes that in no event may an order authorize interception for a period exceeding 30 days, and must be read in that context. The same comment states:
 (Section 2518(5)) requires the time of the warrant to be carefully tailored to the showing of probable cause. The period of authorized interception is intended to begin when the interception in fact begins and terminates when the interception in fact terminates. This will be a question of fact in each case. * * *
 Id. The language can only be read as evidencing a congressional intent that the period of authorization begin to run after installation and last from that time to the expiration of the number of days specified. It does not imply that multiple invasions of protected privacy are valid though not justified by individualized demonstrations of probable cause.
 
 
 [61]
 See, e. g., United States v. James, 494 F.2d 1007, 1017-1023, (D.C.Cir.), cert. denied, 419 U.S. 1020, 95 S.Ct. 495, 42 L.Ed.2d 294 (1974); United States v. Principie, 531 F.2d 1132, 1139-1141 (2d Cir. 1976); United States v. Armocida, 515 F.2d 29, 44-45 (3d Cir.), cert. denied, 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975); United States v. Cox, 462 F.2d 1293 (8th Cir. 1972), cert. denied, 417 U.S. 918, 94 S.Ct. 2623, 41 L.Ed.2d 223 (1974). The purpose of this review is to determine whether the surveillance has been executed with due regard for the statutory command that interception of communications not relevant to the purpose of the surveillance be minimized. See 18 U.S.C. § 2518(5); 23 D.C.Code § 547(g)
 The minimization requirement is a command to limit surveillance as much as is possible in the circumstances. United States v. Cox, supra, 462 F.2d at 1300-1301. The procedure utilized recognizes only that it is
 much easier to describe with particularity in a warrant the nature and contents of a physical object (such as a store or a telephone line) than a conversation which has not yet been heard. * * * (In the case of conversations the officer) can generally determine with exactness whether the conversation is authorized to be seized by the warrant only when he has already taken it into custody by having heard it in its entirety.
 United States v. James, supra, 494 F.2d at 1019, quoting United States v. Focarile, 340 F.Supp. 1033, 1047 (D.Md.1972). See Berger v. New York, supra note 21, 388 U.S. at 98-99, 87 S.Ct. 1873 (Harlan, J., dissenting). There was no intent to alter the requirement that probable cause coextensive with the authorized intrusion be demonstrated. See notes 62 & 63 infra.
 
 
 [62]
 See note 59 supra and notes 63 & 73 infra. The Court in Berger v. New York, supra note 21, may have considered it necessary to conceptualize intrusions on conversational privacy as equivalent to invasions of physical privacy in order to apply the specificity protections of the Fourth Amendment to them. But there is no indication that it intended in the future to treat trespassory intrusions as equivalents of captures of oral communications, or that authorization for the former would be automatically subsumed in authorization for the latter, either of which would have the effect of diminishing the established protection against general warrants. See the discussion in text at pp. ---- - ---- of 180 U.S.App.D.C., pp. 158-162 of 553 F.2d supra
 Furthermore, even if the two types of incursions are to be treated as functionally indistinguishable with regard to the invasion of protected privacy each entails, a proposition which has not been established, compare United States v. Barker, supra note 43, at 178 U.S.App.D.C. 174, 186-187, 546 F.2d 940, 952-953, with United States v. Ehrlichman, supra note 43, 178 U.S.App.D.C. at 172, 546 F.2d at 938 this cannot be taken as supportive of the proposition put forward here. It is argued that when probable cause is shown for an incursion on conversational privacy, trespassory entries which are, in the minds of executing officers, ancillary to capture of oral conversations are necessarily valid. But it is self-evident that when there are two separate incursions on protected privacy the invasion is greater than from either alone, just as an entry which involves seizure of tangible items is more intrusive than an entry to inspect premises. See Camara v. Municipal Court, supra note 27. While no more vigorous degree of probable cause may be required to be shown, the demonstrated need of the applicant should be coextensive with the authority given. See notes 43 & 59 supra.
 Another indication that surreptitious entry must be authorized only on a sufficient showing of probable cause is found in the legislative history of 18 U.S.C. § 2518(4)(b) (23 D.C.Code § 547(a)(2)), the provision requiring the order to delineate the telephone or other communications facilities from which, or the place where, the authority to intercept is granted. As we pointed out above, see note 20 supra, the National Wiretap Commission concluded that this provision was intended to allow surreptitious entries. Though that conclusion is not inevitable, assuming that surreptitious entry to install eavesdropping devices is constitutional and was contemplated by Congress, the Senate Report's reference to Steele v. United States, 267 U.S. 498, 45 S.Ct. 414, 69 L.Ed. 757 (1925), is significant.
 In Steele agents obtained a search warrant for a garage building, but the order listed only one of the two street addresses assigned to the premises. The Court determined that the stated address was not conclusive as to the permissible scope of the search, both because the garage was not apportioned into clearly defined units and because probable cause had been established in the affidavits to search all the parts of the building that were in fact searched. The case establishes that the probable cause showing is determinative of the permissible scope of invasion of privacy and has been cited for the principle that a warrant is overbroad if it allows entries more extensive than the demonstrated probable cause would justify. See United States v. Bermudez, 526 F.2d 89 (2d Cir. 1975), cert. denied, 425 U.S. 970, 96 S.Ct. 2166, 48 L.Ed.2d 793 (1976); note 73 infra. The legislative history provides support, then, for our conclusion that Congress did not intend to alter the traditional protections of the Fourth Amendment against unwarranted physical invasion of the home or office.
 Like the Court in Chimel v. California, supra note 45, 395 U.S. at 767 n.12, 89 S.Ct. at 2042 n.12, "we can see no reason why, simply because some interference with an individual's privacy (e. g., interception of conversations) * * * has lawfully taken place, further intrusions (e. g., surreptitious entries to install or maintain the devices) should automatically be allowed despite the absence of a warrant that the Fourth Amendment would otherwise require."
 
 
 [63]
 The legislative history of Title III is informative:
 Where it is necessary to obtain coverage of only one meeting, the order should not authorize additional surveillance. Compare Osborn v. United States, 385 U.S. 323 (87 S.Ct. 429, 17 L.Ed.2d 394) (1966). Where a course of conduct embracing multiple parties and extending over a period of time is involved, the order may properly authorize proportionately longer surveillance, but in no event for longer than 30 days, unless extensions are granted. * * *
 Senate Report, supra note 13, at 101, U.S.Code Cong. & Admin.News 1968, p. 2190. Osborn is discussed more fully in note 39 supra.
 As with initial orders, extensions must be related in time to the showing of probable cause * * *. * * * Otherwise there is a danger that the showing of probable cause and the additional information in the application will become stale. * * *
 Senate Report at 103, U.S.Code Cong. & Admin.News 1968, p. 2192. The Eighth Circuit has stated:
 We do not, however, read Osborn, Katz and Berger as holding that only "rifle shot" eavesdrops are constitutionally permissible. The dragnet nature of the New York law resulted not only from the duration of the warrant, but also from the failure to confine the investigator's latitude with the various safeguards which the court noted that law did not contain. * * * Accordingly, this wiretap was not simply a "blanket grant of permission to eavesdrop" upon Richardson pursuant to one showing of probable cause as to him. It was a continuing search of several persons' conversations pursuant to a multiple showing of probable cause reaching several people using that telephone. * * *
 United States v. Cox, supra note 61, 462 F.2d at 1303-1304 (emphasis added; footnotes omitted). Though these quotations deal with seizure of conversations, not entries, they amply rebut any contention that Congress, in enacting Title III and the parallel provisions of the District of Columbia Code, intended to alter the traditional rule of Fourth Amendment jurisprudence that the demonstration of probable cause must match the intrusion authorized. See notes 61 & 62 supra.
 
 
 [64]
 That the District Court was correct in rejecting appellant's offer to supplement probable cause at the suppression hearing is evident from Stone v. Powell, 428 U.S. 465, 473 n.3, 96 S.Ct. 3037, 3041, 49 L.Ed.2d 1067 (1976), where the Court stated it would not reach again the oft-rejected contention that the Government should be able to supplement information contained in the affidavits at the hearing on the motion to suppress evidence. See Whiteley v. Warden, supra note 59, 401 U.S. at 565 n.8, 91 S.Ct. 1031; Aguilar v. Texas, supra note 59, 378 U.S. at 109 n.1, 84 S.Ct. 1509; United States v. Acon, 513 F.2d 513, 518 (3d Cir. 1975)
 "Probable cause is not determined by hindsight but as of the time the affidavits were presented to the magistrate." United States v. Rahn, 511 F.2d 290, 292 (10th Cir.), cert. denied, 423 U.S. 825, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975), citing Schoeneman v. United States, 317 F.2d 173 (D.C. Cir. 1963). See Aguilar v. Texas, supra note 59, 378 U.S. at 109 n.1, 84 S.Ct. at 1511 n.1, where the Court stated:
 It is elementary that in passing on the validity of a warrant, the reviewing court may consider only information brought to the magistrate's attention. * * *
 (Emphasis in original.) The discussions between the Assistant United States Attorney and the authorizing judge cannot be looked to in supplementing the probable cause showing of the affidavits since they were neither recorded nor statements of probable cause supported by oath or affirmation, as required by the Fourth Amendment. See, e. g., Dow v. Baird, 389 F.2d 882, 883 (10th Cir. 1968). Cf. United States v. Hill, 500 F.2d 315, 318 (5th Cir. 1974), cert. denied, 420 U.S. 931, 95 S.Ct. 1135, 43 L.Ed.2d 404 (1975), establishing that a magistrate could consistent with Fourth Amendment requirements constitutionally find probable cause from the affidavit and testimony which, though unrecorded, was under oath. But see Rule 41(c), Fed.R.Crim.P. Furthermore, the legislative history of 18 U.S.C. § 2518 states:
 Paragraph (2) provides that the judge may require the applicant to furnish additional testimony or documentary evidence in support of the application. The additional testimony need not be in writing, but it should be under oath or affirmation and a suitable record should be made of it. The use of a court reporter would be the best practice.
 Senate Report, supra note 13, at 102, U.S.Code Cong. & Admin.News, p. 2191.
 Moore v. United States, 461 F.2d 1236 (D.C. Cir. 1970), cited by the Government, does not alter the traditional rule that the language of the warrant is binding and must be the object of the reviewing court's examination. Cf. United States v. Armocida, supra note 61, 515 F.2d at 44-45. While Moore established that in certain limited situations a narrowing affidavit might cure an overbroad warrant, the decision was predicated on the warrant's incorporating the affidavit by reference and the requirement of the District of Columbia Code that the person whose premises were to be entered be presented not only with the warrant but also with a copy of the narrowing affidavit. In this manner the person affected could establish at the outset the reason for the invasion of privacy and could be certain that the affidavits had not been inserted in the file at a later date. 461 F.2d at 1239.
 The rationale for the Moore decision is not present in this case because the warrant did not adopt the affidavit by reference. Moreover, since surreptitious entry depends on lack of notice, the person whose premises are entered has no way to limit the scope of the "search" by demonstrating to the invading officers that the affidavit encompasses less than the warrant would seem to authorize. Furthermore, at best Moore would apply only to those cases where the warrant can be narrowed by reference to the affidavits and the executing officers do not exceed the authority which would have been warranted by the probable cause showing. Cf. United States v. Kaye, 432 F.2d 647 (D.C. Cir. 1970).
 
 
 [65]
 Though the surreptitious entry provision in the order issued in United States v. Agrusa, supra note 12, 541 F.2d 690, was similar in terms to the provision in the intercept order at issue here, Agrusa is not dispositive of this case. Since the appellant there did not challenge the breadth of the authority given, but rather contended that a court could never constitutionally authorize surreptitious entry to install eavesdropping devices, the court was not presented with, nor did it discuss, the issue involved here. Also, we have no way of knowing what affidavits were filed in support of the intercept order issued in Agrusa. It is, therefore, impossible to determine whether we would find the affiants in that case made a probable cause showing sufficient to warrant the authority contained in the somewhat narrower intercept order
 
 
 [66]
 Rule 41(c), Fed.R.Crim.P., requires standard search warrants to be executed within 10 days of issuance. This case does not require decision of the question whether a combined entry and oral surveillance order might validly authorize entries more than 10 days from the date of issuance. But it is significant that the extension order issued by the authorizing judge contained the same surreptitious entry provision as the original order, while the affidavit of probable cause submitted at the time of granting the extension contained no new indication of need to enter the target premises. The only reference to the need for eavesdropping, as opposed to nontrespassory wiretapping, was contained in the original affidavit, a copy of which was resubmitted with the application for the extension order. There is no indication that the authorizing judge, in granting the extension, determined anew that trespass might be necessary. While the supplemental affidavit was sufficient to allow the court to conclude that acquisition of conversations should be continued, it did not document a need to enter the Shoe Circus during the second 20-day period. See the portions of Title III's legislative history quoted at note 63 supra
 
 
 [67]
 See note 59 supra and note 73 infra
 
 
 [68]
 Appellant's reliance on United States v. Peltier, 422 U.S. 531, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975) for the principle that the judicially fashioned exclusionary rule should not be applied where the police "did not act improperly" is misguided. In Peltier the Court was concerned with the issue whether the Fourth Amendment standard announced in Almeida-Sanchez v. United States, supra note 47, was to be given retroactive application. In stating that retroactivity might not apply "if the law enforcement officers reasonably believed in good faith that evidence they had seized was admissible at trial," 422 U.S. at 537, 95 S.Ct. at 2317, because "the 'imperative of judicial integrity' is not offended by the introduction into evidence of that material even if decisions subsequent to the search or seizure have broadened the exclusionary rule to encompass evidence seized in that manner," id., the Court certainly did not establish that the exclusionary rule would in the future be applied only in cases of bad faith violations of the Fourth Amendment. The Court clearly said:
 (W)here it has been determined, as in a case such as Linkletter, that an earlier holding such as Mapp is not to be applied retroactively, it has not been questioned that Mapp was entitled to the benefit of the rule enunciated in her case. See Stovall v. Denno, 388 U.S. 293, at 300-301, (87 S.Ct. 1967, at 1971-1972, 18 L.Ed.2d 1199). * * *
 Id. at 542 n.12, 95 S.Ct. at 2320 n.12. Not only does this case not raise any issue of retroactive application, it is clear that no new principle is being fashioned in determining that a warrant must be supported by probable cause sufficient for the authority granted, and an overbroad warrant is of no assistance in justifying police behavior.
 Moreover, the Court stated as recently as last term that the purpose of the exclusionary rule is satisfied if its application may deter future violations of the Fourth Amendment.
 Evidence obtained by police officers in violation of the Fourth Amendment is excluded at trial in the hope that the frequency of future violations will decrease. Despite the absence of supportive empirical evidence, we have assumed that the immediate effect of exclusion will be to discourage law enforcement officials from violating the Fourth Amendment by removing the incentive to disregard it. More importantly, over the long term, this demonstration that our society attaches serious consequences to violation of constitutional rights is thought to encourage those who formulate law enforcement policies, and the officers who implement them, to incorporate Fourth Amendment ideals into their value system.
 We adhere to the view that these considerations support the implementation of the exclusionary rule at trial and its enforcement on direct appeal of state court convictions. * * *
 Stone v. Powell, supra note 64, 428 U.S. at 492-493, 96 S.Ct. at 3051 (footnotes omitted). It is evident that even if the police acted in this case in a manner which could have been authorized by a valid warrant, the judicial exclusionary rule would, if applied here, deter future Fourth Amendment violations. Katz v. United States, supra note 4. As we have already detailed extensively, action under authority of an invalid warrant is as violative of the Fourth Amendment as warrantless action.
 While the judicial exclusionary rule may be justified partly because of its deterrence function, Stone v. Powell, supra, 428 U.S. at 465, 96 S.Ct. 3037, the suppression provisions of Title III have a broader purpose. 18 U.S.C. § 2515 states:
 Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter.
 The section serves a deterrent function: "to compel compliance with the other prohibitions of the chapter." Senate Report, supra note 13, at 96, U.S.Code Cong. & Admin.News 1968, p. 2184. In addition, its broad scope protects the privacy of communications, a function not necessarily served by the judicial exclusionary rule, and preserves judicial integrity. As the Supreme Court has stated:
 Moreover, § 2515 serves not only to protect the privacy of communications, 10 but also to ensure that the courts do not become partners to illegal conduct: the evidentiary prohibition was enacted also "to protect the integrity of court and administrative proceedings." * * *
 
 
 [10]
 Congressional concern with the protection of the privacy of communications is evident also in the specification of what is to be protected. "The proposed legislation is intended to protect the privacy of the communication itself . . . ." Id., at 90. As defined in Title III, " 'contents,' when used with respect to any wire or oral communication, includes any information concerning the identity of the parties to such communication or the existence, substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8). The definition thus "include(s) all aspects of the communication itself. No aspect, including the identity of the parties, the substance of the communication between them, or the fact of the communication itself, is excluded. The privacy of the communication to be protected is intended to be comprehensive." S.Rep.No.1097, supra, at 91
 Gelbard v. United States, supra note 54, 408 U.S. at 51, 92 S.Ct. at 2362-2363, quoting in text from § 801(b), 82 Stat. 211.
 
 
 [69]
 18 U.S.C. § 2513 ("in violation of section 2511 or section 2512 of this chapter"); 23 D.C.Code § 544 ("in violation of section 23-542 or 23-543"); 18 U.S.C. § 2517(4) ("in accordance with, or in violation of, the provisions of this chapter"); 23 D.C.Code § 547(d) ("in accordance with, or in violation of, the provisions of this subchapter"); 18 U.S.C. § 2518(7)(b) ("in violation of this chapter"); 23 D.C.Code § 549(c) ("(a)ny violation of the provisions of this subchapter"); 18 U.S.C. § 2518(8)(c) ("(a)ny violation of the provisions of this subsection"); 18 U.S.C. § 2520 ("in violation of this chapter"); 23 D.C.Code § 554(a) ("in violation of this subchapter")
 
 
 [70]
 See S.Rep.No.91-538, supra note 4. This report accompanied S. 2869, which was the original bill on electronic surveillance for the District of Columbia and which was incorporated in the later version of S. 2601 that was adopted by the Conference Committee and ultimately enacted into law. See H.R.Rep.No.91-1303, 91st Cong., 2d Sess. 237 (1970) (Conference Report); 116 Cong.Rec. 24149 (1970) (remarks of Sen. Tydings); 116 Cong.Rec. 8913 (1970) (remarks of Sen. Tydings). That report, with reference to overbreadth in the warrant, stated:
 The order entered by the court need not be in the form requested by the application; rather, it is anticipated that the order will be framed narrowly, consistent at once with the right to privacy of the aggrieved persons, on the one hand, and, on the other hand, the demonstrated and cognizable needs of the applicant and legislative policy favoring improved law enforcement manifest in this title. * * *
 S.Rep.No.91-538 at 20-21 (emphasis added). See also Senate Report, supra note 13, at 102 U.S.Code Cong. & Admin.News 1968, p. 2191:
 (Title III is) intended to meet the test of the Constitution that electronic surveillance techniques be used only under the most precise and discriminate circumstances, which fully comply with the requirement of particularity (Berger v. New York, 388 U.S. 41, 58-60, (87 S.Ct. 1873, 18 L.Ed.2d 1040) (1967), Katz v. United States, 389 U.S. 347, (355-356, 88 S.Ct. 507, 19 L.Ed.2d 576) (1967)).
 (Emphasis added.)
 
 
 [71]
 See e. g., United States v. Chavez, 416 U.S. 562, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974); United States v. Vigi, 515 F.2d 290 (6th Cir.), cert. denied, 423 U.S. 912, 96 S.Ct. 215, 46 L.Ed.2d 140 (1975)
 
 
 [72]
 See note 64 supra. United States v. Cirillo, 499 F.2d 872 (2d Cir.), cert. denied, 419 U.S. 1056, 95 S.Ct. 638, 42 L.Ed.2d 653 (1974), relied upon by appellant as a case where subsequent affidavits were allowed to cure a warrant, is inapposite. There through clerical error the statutorily required minimization provision was omitted, making the order seemingly overbroad. Finding the minimization command essentially cumulative of other requirements of the New York Code of Criminal Procedure, and determining by standard post-surveillance review that the executing officers had minimized interceptions, the court allowed the officers to demonstrate by subsequent affidavit that they had been aware of the requirement to minimize. Though the particularized findings of the Cirillo court are sufficient to distinguish the case, we note also that what was involved was an area where only post-surveillance review is feasible in any event. See note 61 and accompanying text supra
 
 
 [73]
 Like warrants issued on insufficient probable cause, see Whiteley v. Warden, supra note 59, overbroad warrants are invalid and cannot justify otherwise impermissible actions. Chimel v. California, supra note 45, 395 U.S. at 776 n.7 89 S.Ct. 2034 (White, J., dissenting); Berger v. New York, supra note 21, 388 U.S. at 69-70, 87 S.Ct. 1873 (Stewart, J., concurring). Accord, United States v. Bermudez, supra note 62; United States v. Olt, 492 F.2d 910, 911 (6th Cir. 1974), and cases cited therein; cf. United States v. Kaye, supra note 64. See also note 59 supra. Authorization which rests on speculation, conjecture, or anticipation is clearly invalid. United States v. Cobb, 432 F.2d 716, 719 (4th Cir. 1970). Cf. Spinelli v. United States, supra note 59; United States v. Roberts, 333 F.Supp. 786 (E.D.Tenn.1971), quoting Durham v. United States, 403 F.2d 190 (9th Cir. 1968)
 
 
 [74]
 See United States v. Hill, supra note 64; United States v. Ceraso, 467 F.2d 647, 653 (3d Cir. 1972); United States v. Ceraso, 355 F.Supp. 126 (M.D.Pa.1973). See also United States v. Poeta, 455 F.2d 117 (2d Cir.) cert. denied, 406 U.S. 948, 92 S.Ct. 2041, 32 L.Ed.2d 337 (1972). But see United States v. Kaye, supra note 64
 
 
 [75]
 In United States v. Chavez, supra note 71, the Court declared that violation of a statutory provision that does not "affect the fulfillment of any of the reviewing or approval functions required by Congress," 416 U.S. at 575, 94 S.Ct. at 1856, does not render conversations "unlawfully intercepted" within the meaning of 18 U.S.C. § 2518(10)(a)(i) (23 D.C.Code § 551(b)(1)). It is by no means clear that this standard, or the substantiality standard of United States v. Giordano, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974), adverted to in text, is to be applied to constitutional violations. See Chavez, 416 U.S. at 570, 94 S.Ct. at 1854, where the Court explicitly stated there was "no claim of any constitutional infirmity arising from" the defect; United States v. Ceraso, supra note 74, 355 F.Supp. 126. We need not reach that issue, however, because the present case would still require suppression
 While Chavez involved a statutory violation, the failing was found to be merely technical because the approval and review functions required as preconditions to issuance of an intercept order and intended by Congress as a means of limiting use of electronic surveillance had been fulfilled. Though the application and intercept order identified an Assistant Attorney General as having given approval for the application, the Attorney General had in fact given the required approval. 416 U.S. at 573-574, 94 S.Ct. 1849. Since either procedure was sufficient under the statutory scheme, see 18 U.S.C. § 2516(1), the Court rejected the contention that the misidentification of the procedure utilized required suppression.
 In Giordano, on the other hand, the Attorney General in fact had not approved the application for the wiretap order which issued, nor had he specifically designated an Assistant Attorney General to authorize application. Approval came instead from the Attorney General's Executive Assistant. While both Chavez and Giordano involved statutory violations, the Court found suppression mandated in Giordano because there the result of the violation was a failure to interpose a safeguard between enforcement officers and the persons whose privacy was to be invaded. Congress required the judgment of a politically responsible official as a precondition of lawful electronic surveillance in order to limit its use. 416 U.S. at 527-528, 94 S.Ct. 1820. The Attorney General's failure to review the necessity for granting the authority led to the warrant's invalidity; conversations seized under its authority were "unlawfully intercepted" within the meaning of 18 U.S.C. § 2518(10)(a)(i).
 In the present case, like Giordano, the intercept order issued without sufficient review of the need for the authority granted. See also note 78 infra.
 
 
 [76]
 See notes 43, 57, 59, 62, 63 supra. In United States v. Agrusa, supra note 12, the court approved a warrant which authorized a single surreptitious entry to install eavesdropping devices and subsequent interception of oral communications. The court stated:
 We are not concerned with the fact that the same document served to authorize both the interceptions and the breaking * * * . (T)here was probable cause to believe that specified crimes had been, were being, or would be committed and sufficient reason for the Government both to break and enter and to intercept. This is precisely, and, in respects here material, all that the Fourth Amendment and sound reason require.
 541 F.2d at 695-696 n.11 (emphasis added). It is clear that the court contemplated that the Fourth Amendment required the Government to establish, to a magistrate, "sufficient reason" or need for the authority contained in the intercept order, both as to the physical invasion authorized and the seizure of oral communications. See also 541 F.2d at 696 n.13.
 
 
 [77]
 The decisions in Chavez and Giordano were recently affirmed by the Supreme Court in United States v. Donovan, 429 U.S. 413, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977), in which the Court again considered the scope of the "unlawfully intercepted" provision of 18 U.S.C. § 2518(10)(a)(i). There the Court held that the Government's failure to satisfy fully the requirement of 18 U.S.C. § 2518(1)(b)(iv) (requiring the Government to include in its wiretap applications the identity of the person committing the offense and whose conversations are to be intercepted) did not warrant suppression since the requirement does not play a "substantive role" with respect to judicial authorization. 429 U.S. at 435, 97 S.Ct. 658. Similarly, the Court also held that suppression was not warranted merely because of the Government's inadvertent failure to inform the issuing judge of the identities of all the persons whose conversations were overheard in the course of the interception as contemplated by § 2518(8)(d). The Court noted that "we do not think that postintercept notice was intended to serve as an independent restraint on resort to the wiretap procedure." 420 U.S. at 439, 97 S.Ct. at 674
 In its opinion, however, the Court drew a sharp distinction between minor, technical violations of Title III (such as were at issue in Donovan ) and constitutional violations (such as we consider here). The Court stated: "Nothing in the legislative history indicates that Congress intended to declare an otherwise constitutional intercept order 'unlawful' under § 2518(10) (a)(i) resulting in suppression under § 2515 for failure to name additional targets (of the intercept order)." 429 U.S. at 437 n.25, 97 S.Ct. at 673 n.25 (emphasis added). Here, in clear contrast to the facts of Donovan, we consider an unconstitutional intercept order. As the Court implied in Donovan, the suppression remedy that was inappropriate for the minor, nonconstitutional defects there involved is entirely appropriate for the major, constitutional defect here involved.
 
 
 [78]
 Since the intercept order defined the limits of permissible activity, see United States v. Armocida, supra note 61, and the authority was overbroad, suppression is mandated. See United States v. Lamonge, 458 F.2d 197 (6th Cir.), cert. denied, 409 U.S. 863, 93 S.Ct. 153, 34 L.Ed.2d 110 (1972), where the relevant intercept order permitting non-trespassory wiretapping was issued in undated form. As here, the probable cause showing simply did not justify the authority granted by the order; the order was overbroad. Even though the executing officers had acted in a manner which might have been authorized by a valid order, complying with the intended limitation on duration, the court held the order invalid and suppression of the conversations mandated. 458 F.2d at 199
 
 
 [79]
 (T)he term "aggrieved person" means a person who was a party to any intercepted wire or oral communication or a person against whom the interception was directed(.)
 
 
 [23]
 D.C.Code § 541(9); 18 U.S.C. § 2518(10)(a). Each of the appellees was clearly "a person against whom the interception was directed." All but two Daniel Haile, Jr. and Jerome Smith were specifically named in the original application for surveillance authorization or in the application for extension of the authorization. The two who were not named were intended to be included in the reference (which appeared in both applications and both authorizations) to "principals, confederates and suppliers, as yet unknown * * * " who were parties to the alleged conspiracy for which appellees were subsequently indicted
 To hold that any of the appellees here was not "a person against whom the interception was directed" would do violence to the plain language of the statute. See Comment, Electronic Surveillance by Law Enforcement Officers, 64 Nw.U.L.Rev. 63, 82 (1969). But cf. United States v. Armocida, supra note 61; United States v. Bynum, 513 F.2d 533, 535 (2d Cir. 1975).